IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LEN NGUYEN,

        Petitioner,               No. CIV S-03-2381 MCE GGH P

    vs.

M. KNOWLES, Warden,           FINDINGS AND RECOMMENDATIONS

        Respondent.

_____/

I. Introduction

        Petitioner, a state prisoner proceeding with appointed counsel, has filed a petition pursuant to 28 U.S.C. § 2254. Petitioner was convicted in San Joaquin County Superior Court following a jury trial in 1997 of first degree murder, attempted murder and carrying a loaded firearm in a vehicle for which he was sentenced to a term of 25 years to life. Amended Petition (AP) (docket # 23), p. 1. Petitioner raises the following grounds: 1) insufficient evidence to sustain the first degree murder conviction (also applicable to petitioner's conviction for attempted murder); 2) trial court's failure to identify and define the "target offenses" under the natural and probable consequences doctrine violated petitioner's due process rights; 3) prosecutorial misconduct violated petitioner's right to due process; 4) cumulative effect of errors

\\\\\

1  violated petitioner's due process rights.  AP, pp. 5-24.[1]

2  II. AEDPA

3        The statutory limitations of federal courts' power to issue habeas corpus relief for

4  persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

5  Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim-
>
>> (1) resulted in a decision that was contrary to, or
>> involved an unreasonable application of, clearly
>> established Federal law, as determined by the
>> Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an
>> unreasonable determination of the facts in light of
>> the evidence presented in the State court
>> proceeding.

14        As a preliminary matter, the Supreme Court has recently held and reconfirmed

15  "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to

16  have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (U.S. 2011).

17  Rather, "when a federal claim has been presented to a state court and the state court has denied

18  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

_____

[1] This case was stayed, on July 16, 2004, pending exhaustion of a claim of ineffective assistance of counsel; petitioner was therein "directed, immediately upon exhaustion, to inform the court and respondent by filing an amended petition containing all of petitioner's exhausted claims."  See Order, filed on 7/16/04.  On September 21, 2009, this court filed an order, noting that the case had been stayed for more than five years without the filing of an amended petition and directed petitioner's counsel to show cause why the stay should not be lifted.  In a brief response, counsel for petitioner asked the court either to strike the sixth, ineffective assistance claim, from the original petition or permit counsel to file an exhausted-claims-only petition.  See docket # 21, filed on 10/01/09.  Petitioner was directed to file an amended petition of only his exhausted claims with any supporting memoranda, as an electronic filing system had been implemented in the intervening years.  See Order, filed on 10/14/09.  An Amended Petition was filed on October 28, 2009; an Answer, following an extension of time which was granted, was filed on January 28, 2010; and a Traverse, also following the granting of an extension of time, was filed on April 1, 2010.

of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, supra, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004). Accordingly, "a habeas court must determine what arguments or theories supported or . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

1    light of the evidence presented in the state court proceeding."  It makes no sense to interpret

2    "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

3    § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

4    same record could not abide by the state court factual determination.  A petitioner must show

5    clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

6    U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

7            The habeas corpus petitioner bears the burden of demonstrating the objectively

8    unreasonable nature of the state court decision in light of controlling Supreme Court authority.

9    Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

10   show that the state court's ruling on the claim being presented in federal court was so lacking in

11   justification that there was an error well understood and comprehended in existing law beyond

12   any possibility for fairminded disagreement."  Harrington, supra, 131 S.Ct. at 786-787.  "Clearly

13   established" law is law that has been "squarely addressed" by the United States Supreme Court.

14   Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

15   settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

16   Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state

17   sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

18   prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

19   established law when spectators' conduct is the alleged cause of bias injection).  The established

20   Supreme Court authority reviewed must be a pronouncement on constitutional principles, or

21   other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

22   federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

23           The state courts need not have cited to federal authority, or even have indicated

24   awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S.Ct.

25   at 365.  Where the state courts have not addressed the constitutional issue in dispute in any

26   reasoned opinion, the federal court will independently review the record in adjudication of that

4

1  issue.  "Independent review of the record is not de novo review of the constitutional issue, but

2  rather, the only method by which we can determine whether a silent state court decision is

3  objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

4  III. Background

5          Petitioner relies on the facts of the offenses as set forth in the Third Circuit Court

6  of Appeals decision which consolidated all of the direct appeals of petitioner and his three co-

7  defendants in an unpublished decision, People v. Kiet Tran, et al., 2003 WL 21061575 (Cal.

8  App.3rd Dist. May 13, 2003).  See Amended Petition (AP), p. 2 n. 1.  Respondent asks the court,

9  pursuant to Fed. R. Evid. 201, to take judicial notice of the Findings and Recommendations,[2] in a

10  co-defendant's, Nhat Nguyen's, federal habeas petition, Nguyen v. Kane, Case No. 2:04-CV-

11  1829 GEB JFM (HC) (2009 WL 3823962) (E.D. Cal. Nov. 13, 2009), a copy of which

12  respondent attaches as Exhibit A to the Answer.  Answer, p. 5 & Ex. A.  Although petitioner

13  disagrees with the ultimate conclusions drawn by Magistrate Judge Moulds, he concedes that

14  judicial notice may be taken of the decisions of other courts pursuant to Rule 201(b)(2).[3]  The

15  undersigned grants the request for judicial notice of November 13, 2009 Findings and

16  Recommendations of Nguyen v. Kane, Case No. 2:04-CV-1829 GEB JFM (HC).  See United

17  States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own

18  records in other cases....").  Judge Moulds in his Findings and Recommendations takes the facts

19  from the same Third District Court of Appeal opinion[4] that petitioner cites.

---

20

21     [2] The Findings and Recommendations in Case No. 2:04-CV-1829 GEB JFM (HC)
denying the petition were filed on November 13, 2009, adopted by Order, filed on January 12,
2010, and judgment thereon entered.

22

23     [3]  Under Fed. R. Evid. 201(b)(2), "[a] judicially noticed fact must be one not subject to
reasonable dispute in that it is ...(2) capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned."

24

25     [4] When the California Supreme Court is silent as to why petitioner's habeas petition was
denied, it is permissible to "look through" its decision to the last reasoned state court decision,

26  which was that of the Third Appellate District.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111
S. Ct. 2590 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim,

Sixteen-year-old Andy Tran suffered a fatal gunshot wound to his chest as he ducked behind the couch in a friend's living room. An adult houseguest in the home, Sen Dang, was also shot, but not fatally, during the same incident. A jury convicted defendants Kiet Ahn Tran (Kiet), Si Van Dang (Si), Nhat Minh Nguyen (Nhat), and Len Nguyen (Len) of the first degree murder of Andy Tran (Andy) (Pen.Code, § 187) FN1 and the attempted murder of Sen Dang (§§ 664/187).FN2

> FN1. Unless otherwise designated, all further statutory references are to the Penal Code.

> FN2. Because several defendants, the deceased, and some witnesses have identical surnames, for clarity and out of no disrespect, we shall refer to the defendants and the deceased by their first names.

---------------------------------------------------------------------

## FACTUAL AND PROCEDURAL BACKGROUND

Because defendants contest the sufficiency of the evidence, " 'we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal.Rptr.2d 23, 864 P.2d 103, citation omitted.)  Based on that standard, the evidence at trial established the following:

### I. The Shooting and Its Aftermath

At the time of these events, both defendant Len and the victim, Andy, were students at Plaza Robles High School, a continuation high school. Len attended the first daily session, which ended at 10:15 each morning, and Andy attended the second session, which began at 10:25 a.m.

Andy was a close friend of Cuong Phan's.  Cuong Phan lived with his family across the street from the school, and Andy often went to his house (the Phan house) before or after school.  Although Len had also visited the Phan house, Cuong Phan observed that Len and Andy did not get along.

On March 6, 1996-the day before the shooting-shortly after the first session of the high school, Len and Andy got into a fight outside the Phan house after Andy told Len to shut the door to the house and Len failed or refused to do so.  The fight did not last long.

---

later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

And when it was over, Cuong Phan's cousin took Len home. FN4

> FN4. Cuong Phan's cousin was Tang Tran, also
> called Tyrone. Another defendant, Si, had visited
> Tang Tran at the Phan house several times.

Len immediately contacted defendant Si and reported that he had experienced a problem with Andy.  All four defendants then went to the Phan house, searching for Andy and Cuong Phan, but neither were there.

The next morning, Si called defendants Kiet and Nhat to wake them, picked them up at their respective homes, and drove them to the Phan house, where they arrived about 10:10 a.m.  Cuong Phan was inside with his family, his parents' friend Sen Dang, and his friends Phillip Nguyen and Huy Vo. Si approached the Phan house and knocked on the front door.  When no one answered, Si returned to his parked car and stood smoking and talking with Kiet and Nhat.

A few minutes later, Si, Kiet, and Nhat saw Andy's mother drop him off for the second school session.  Passing a short distance from where the three defendants then stood, Andy approached the Phan house, knocked, and was admitted.

Si waited for Len.  As the first school session ended, Len approached the other defendants standing near Si's car. The four appeared to talk seriously for a moment.  Then, Si, Nhat, and Kiet took off their jackets and put them into the car, and all of the defendants approached the Phan house.  Cuong Phan testified at trial that through a window, he saw that Si and two others were approaching the house.

Suddenly, the front door opened. Testimony was in conflict as to whether defendants knocked on the door and were admitted by someone inside the house, or merely let themselves in. In any event, defendants stepped into the living room entry or stood just outside the entry as Cuong Phan, Andy, Phillip Nguyen, and Huy Vo simultaneously entered the living room from the hall. FN5 Sen Dang was also in the living room, having slept the night on the couch.

> FN5. Testimony at trial about which of the four
> defendants were in the house was somewhat in
> conflict.  Cuong Phan and Huy Vo testified that
> only three defendants-Si, Nhat, and Kiet-were in the
> house.  But students waiting across the street for the
> second session to begin saw defendants approach
> the house, and anticipating a fight, watched to see
> what would happen.  One such student saw all four
> defendants enter the house, led by Si and Len. Si

also testified that Len was in the house with him.

A witness across the street from the Phan house testified that as defendants entered the house, they "threw up" their hands in a quick gesture, as if to indicate that they were "calling someone out ... to fight."

Cuong Phan told Si to "[g]et the fuck out of my house." Si responded, "[F]uck you," and asked Kiet for the gun. Kiet pulled a black handgun from his waistband and handed it to Si; Si started shooting in Andy's direction. Andy ducked behind the couch, but was killed by a bullet that pierced the couch and went through his chest. Once struck by the bullet, Andy fell face down onto the floor. Sen Dang was hit near the left ankle by a bullet.

Witnesses in the house testified that Si began shooting immediately or within five seconds of his exchange with Cuong Phan. Witnesses across the street likewise testified that Si started shooting "right away" after entering the house at virtually the same moment that the door opened. Those who heard or saw the shots generally agreed that all of the shots were fired from the vicinity of the front door, although testimony on the number of shots fired varied from between three and five to eight.

Defendants ran to Si's car, but it failed to start. They accordingly fled on foot. Cuong Phan appeared to give chase, but quickly returned to the house. Some witnesses testified that Cuong Phan had no gun and that his hands were empty. However, Si claimed that Cuong Phan had a gun as he chased defendants and claimed that he heard gunshots.

Responding quickly to the 911 call from the Phan house,FN6 police recovered a total of five spent nine-millimeter shell casings from the linoleum living room entry and just outside the front door. Police also searched outside the house and around the block for other shell casings and blood, but found none. Investigating Department of Justice criminalists concluded, based on the location of the bullet holes, that all of the shots had been fired from the direction of the front door toward the couch.

FN6. The 911 call was received at about 10:18 a.m.

However, a single spent .380 shell casing was found behind the couch near where Andy lay after he was shot. Both officers and criminalists observed that the casing appeared to have dust on it and concluded that it was neither recently placed there nor involved in the shooting.FN7 A criminalist also noted that there was no evidence of powder marks on the back of the couch or bullet strikes near the front door so as to suggest that the .380 shell casing had been discharged recently. A thorough search of the Phan house after the shooting revealed no evidence of weapons or

live ammunition, and officers found no weapons on Andy, Cuong Phan, Phillip Nguyen, or Huy Vo.

> FN7. Members of the Phan family testified that they had never seen anyone clean behind the couch.

After hiding for a while in a neighbor's yard, defendants contacted a friend, Hung Nguyen, who picked them up in his car.

Later that day, police observed Hung Nguyen's car (in which Kiet was then the sole passenger) arrive at Si's house, where Hung Nguyen retrieved a black bag, which he put into the car's passenger compartment. Hung Nguyen later testified that Si had asked him to "save" the bag, and that Si had agreed to pick it up the next day. The black bag contained a sawed-off shotgun without a serial number and several boxes of ammunition.  In the trunk, police also found a shotgun and a purple gym bag that contained ammunition and three more loaded guns, including a loaded nine-millimeter pistol.  In total, more than 200 rounds of ammunition were recovered from the car.

By evening on the day of the shooting, all four defendants and Hung Nguyen had been apprehended. Police observed that Si had a small scratch on the back of his leg.

Defendants waived their *Miranda* FN8 rights and agreed to be interviewed by police.  Nhat admitted that he was at the house during the shooting and said that his fingerprints might be on the gun-a black semiautomatic nine-millimeter pistol-because he had carried the gun as he ran from the scene, and later hid it in a neighboring yard.  Len also admitted that he had gone to the Phan house on the morning of the shooting.  On the other hand, Kiet denied being in the house when Andy was shot; he told police that he had waited in the car while the others were inside, and ran when he heard gunfire.

> FN8. *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

The nine-millimeter pistol recovered from the purple bag in the trunk of Hung Nguyen's car proved to be the murder weapon.  And a microscopic evaluation of the nine-millimeter shell casings found at the Phan house revealed that all were fired by that pistol, including the bullet that killed Andy.

The fingerprints of Si and Nhat were recovered from Si's car outside the Phan house.  Kiet's palm print was recovered from the shotgun found in the trunk of Hung Nguyen's car.

Defendants were charged with the first degree murder of Andy (§ 187 [count 1] ) and the attempted murder of Sen Dang (§§ 664/187

9

[count 2] ). Arming and personal firearm use enhancements (§§ 12022, subd. (a)(1), 12022.5, subd. (a)(1)) were alleged against all defendants except Len, against whom only an arming enhancement was alleged (§ 12022, subd. (a)(1)).  As to Si only, it was also alleged that he had inflicted great bodily harm against Sen Dang (§ 12022.7).  Hung Nguyen was charged as an accessory to murder after the fact. (§ 32 [count 3] ).

Hung Nguyen and the defendants (except for Len) were also charged with receiving a stolen nine-millimeter, semiautomatic pistol (§ 496, subd. (a) [count 4] ), and Kiet, Len, and Hung Nguyen were charged with other weapon offenses not relevant here.

**II. The Prosecution Theory**

The prosecution's theory at trial was that defendants were members of a criminal street gang called the Mafia Asian Crew, that they believed Andy to be a member of a rival street gang, and that the shooting was a "home invasion murder" committed in retaliation for Andy's fight with Len the previous day.

In support of that theory, the prosecution introduced evidence that Nhat told a jail classification officer FN9 after his arrest that he was a member of the Mafia Asian Crew (MAC) and that its members had problems with gangs (among others) named Vietnamese (or Viet) Asian Pride (VAP) and Lifetime Brothers. Nhat also said that Andy and most of the others at the Phan house were members of the Lifetime Brothers.

> FN9. Classification officers are charged with evaluating with whom arrestees should be housed in jail.

Si's girlfriend, Ahn Phan, told police that "Si and his friends FN10 belonged to MAC" and that MAC members were having problems with members of the gang VAP.FN11

> FN10. Ahn Phan did not identify "Si's friends," but during his interview with police, Si repeatedly referred to Len as "my friend."

> FN11. At trial, however, Si's girlfriend denied that Si was a member of MAC.

Si advised the classification officer that if he were housed in jail with members of the Lifetime Brothers or VAP, there would be trouble because Andy was a member of one of those gangs-although not too much trouble because most of them were juveniles.  Si also said that his friends might be recognized as gang members. Although Si denied gang membership for himself, when

10

officers told him that his girlfriend had identified the gang in which he was a member, he agreed to tell the truth if they named the gang. The officer responded, "You got it.  M.A.C. Sorry." And Si responded, "You got me, huh."  Checking, the officer asked, "Okay, so, is that true?" And Si responded, "Yeah. No. Yeah."

A student watching the Phan house from across the street on the morning of the shooting testified that she thought there might be gunplay when the defendants suddenly appeared in a group at the Phan house because they had not "gotten along" with Andy and his friends for a long time.

Sometime before trial, Hung Nguyen pleaded no contest to the charges against him.  He testified under a grant of immunity that after the shooting, Kiet had retrieved from Kiet's house the purple gym bag that was in his car trunk and which later proved to contain the murder weapon, and a long wrapped item that could have been the shotgun found in his trunk.

**III. The Defense Case**

Of the defendants at trial, only Si testified.  He admitted shooting Andy, but testified that he had done so in self-defense.

Si testified that immediately after he entered the Phan house, Andy confronted him with a .380-caliber automatic handgun and shot twice; one bullet grazed Si's left leg.FN12 Only then, after Si turned to run out the door and yelled that Andy was shooting at him, did Kiet hand him a gun, with which Si then returned fire into the house because he knew Len was "trapped" there. FN13 According to Si, he and Andy exchanged several volleys of gunfire, with Andy firing six or seven shots, and Si shooting about five.FN14 Even after Si heard a scream, Andy continued to shoot at him.  After he and the other defendants ran from the Phan house, Cuong Phan chased after them, and Si heard three or four additional shots fired at him.

> FN12. Si also testified that Andy, not Cuong Phan, said, "[G]et the fuck out of the house."

> FN13. Si denied knowing in advance that Kiet had a gun and denied ever having held a gun before.

> FN14. With the exception of the bullet that grazed his leg, Si testified that all of Andy's shots went through the open front door.

At trial, Si also denied that he went to the Phan house on the day of the shooting to beat up Andy in retaliation for his having fought with Len, although he knew that there would be "more trouble" if he walked into the Phan house with Len.  He adopted his police

interview statement that he had gone to the Phan house that day to collect money from Cuong Phan's cousin, to protect Len, and to "escort" him home.  Of Len's dispute with Andy, Si opined that it was disrespectful for Andy to have been fighting with Len and further that it would be disrespectful to Cuong Phan's cousin were he to beat up Andy in the Phan house while the cousin was at home.

Finally, Si denied ever having been a member of MAC and said that Nhat alone among the defendants had been a member.  Si admitted, however, that he had lied to police during his interview about who shot Andy.

In support of the theory that Si shot Andy in self-defense, Nhat introduced the testimony of Ben Schiefelbein, a Ph.D. in chemistry, who testified that he found four particles on Andy's right hand containing elements that are unique to gunshot residue and four particles on his left hand that are consistent with, but not unique to, gunshot residue.  Under cross-examination by the prosecutor, however, Schiefelbein acknowledged that Andy had not fired a gun because, had he done so, more particles would have been found on his hands.  The presence of so few particles on Andy's hand could be explained, in Schiefelbein's opinion, by the fact that several gunshots in a relatively small room could produce a "cloud of gunshot residue," which would "settle on everything," including Andy's hands.

Another forensic scientist, Michelle Fox, did not examine evidence from the scene, but testified on Nhat's behalf that the number of particles found is not generally significant to an analysis of the presence of gunshot residue and that gunshot residue can deposit on someone's hand only if the gun is fired within a few feet of the person.

Anticipating Si's assertion that he had been shot by Andy, the prosecutor introduced the following evidence: None of the boys running from the scene were observed limping; the pants that Si had been wearing had no bullet hole; Si's girlfriend had told police that Si did not report that he had been shot, which he would have done had it happened; and the wound on Si's leg was a mere scratch, similar to one found on Kiet's wrist after his arrest.

Finally, the defense introduced evidence from one neighbor who testified that on the day of the shooting she saw three or four boys running, and one other boy, who appeared to be chasing the others and holding a gun. Thereafter, she heard one or two gunshots, although she saw no one shoot.

**IV. The Convictions**

The jury convicted defendants of the first degree murder of Andy,

12

for which each defendant subsequently received a sentence of 25
years to life, and of the attempted murder of Sen Dang, for which
each defendant received a concurrent sentence of seven years. The
jury also found that in committing these offenses, Si and Kiet were
personally armed with a firearm (§ 12022, subd. (a)(1)) and that Si
both personally used a firearm (§ 12022.5, subd. (a)(1)) and
intended to inflict great bodily injury upon Sen Dang (§ 12022.7,
subd. (a)).

People v. Tran, 2003 WL 21061575 at *1-*6; Findings and Recommendations, Case No. 2:04-

CV-1829 GEB JFM, 11/13/09, at  pp. 2-9.

IV. Claims & Analysis

Claim 1: Sufficiency of the Evidence Challenge

In the first claim, petitioner contends that there was insufficient evidence to

sustain his first degree murder conviction as an aider and abettor and seeks to incorporate the

same argument as to his conviction for attempted murder.  AP, pp. 5-10; Traverse, 3-4.  The state

appellate court addressed this claim as to both the first degree murder conviction of petitioner,

inter alia, as well as the challenge to petitioner's[5] conviction for attempted murder, as follows[6]:

**A. The Murder Convictions of Len and Nhat Are Supported by
Substantial Evidence**

We turn first to Nhat and Len's contentions over the sufficiency of
the evidence of their murder convictions.

"Under California law, a person who aids and abets the
commission of a crime is a 'principal' in the crime, and thus shares
the guilt of the actual perpetrator. (§ 31.)" (*Prettyman, supra*, 14
Cal.4th at p. 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

" 'A person aids and abets the commission of a crime when he or
she, (I) with knowledge of the unlawful purpose of the perpetrator,
(ii) and with the intent or purpose of committing, facilitating, or
encouraging commission of a crime, (iii) by act or advice, aids,
promotes, encourages or instigates the commission of the crime.' "

---

[5] References to "Len" within the state appellate opinion are references to petitioner
herein.

[6] This portion of the Third District Court of Appeals decision is also incorporated within
the Findings and Recommendations, Case No. 2:04-CV-1829 GEB JFM, at pp. 40-47.

(*People v. Campbell* (1994) 25 Cal.App.4th 402, 409, 30 Cal.Rptr.2d 525.) While neither presence at the scene of a crime nor knowledge of, but failure to prevent the crime, is sufficient to establish aiding and abetting ( ibid.), " '[t]he presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he was guilty of aiding and abetting....' " (*People v. Moore* (1953) 120 Cal.App.2d 303, 306, 260 P.2d 1011.) Further, an unarmed aider and abettor may be responsible in the same degree as the actual perpetrator. (*People v. Perkins* (1951) 37 Cal.2d 62, 64, 230 P.2d 353.)

In this case, the jury found Si guilty of the first degree murder of Andy. Defendants Len and Nhat were tried solely in their capacity as aiders and abettors. To convict Len and Nhat of first degree murder, the jury had to find that they knew of Si's criminal intent and intended to facilitate Si's intended crime. FN21 (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.)

> FN21. Defendants do not dispute that Si's conviction for Andy's murder is supported by substantial evidence.

Whether Len and Nhat possessed the requisite criminal intent poses a question of fact, to which we apply the usual appellate standard of review: "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence-i.e., evidence that is credible and of solid value-from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Green* (1980) 27 Cal.3d 1, 55, 164 Cal.Rptr. 1, 609 P.2d 468, disapproved on other grounds in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3, 226 Cal.Rptr. 112, 718 P.2d 99, and *People v. Martinez* (1999) 20 Cal.4th 225, 239, 83 Cal.Rptr.2d 533, 973 P.2d 512; see also *People v. Johnson* (1993) 6 Cal.4th 1, 38, 23 Cal.Rptr.2d 593, 859 P.2d 673.) We do not ask whether this court could have been persuaded by the evidence beyond a reasonable doubt, but whether "any rational trier of fact" could have been. ( *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573]; see *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192, 27 Cal.Rptr.2d 695.) This same standard applies to the review of circumstantial evidence. ( *People v. Ceja* (1993) 4 Cal.4th 1134, 1138, 17 Cal.Rptr.2d 375, 847 P.2d 55.)

Applying these principles to the present case, we conclude that substantial evidence supports the jury's determination that Len and Nhat knew that Si intended to shoot Andy, that they intended to facilitate, aid, or promote the commission of that offense, and that they in fact did so.

First, the manner of Andy's killing is indicative of premeditation and deliberation by all four defendants.  According to witnesses both inside and outside the Phan house, mere seconds elapsed between the time the front door opened, and Si shot and killed Andy.  The speed and effectiveness with which this was accomplished suggests that it represented the execution of a prearranged plan. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 957, 42 Cal.Rptr.2d 636, 897 P.2d 574 [the manner of killing may provide sufficient evidence of premeditation and deliberation, even where evidence of planning and motive are minimal], disapproved on a different point in *People v. Lasko* (2000) 23 Cal.4th 101, 110, 96 Cal.Rptr.2d 441, 999 P.2d 666.)

Second, there was evidence that all of the defendants participated in the planning and promotion of the crime. When defendants' initial attempt to locate Andy was unsuccessful, Si collected Nhat and Kiet the very next morning and went to the Phan house. He did so at a time when the three defendants would expect Len to soon join them and when Andy was also expected to be at or near the Phan house. The lapse of a day between Len's fight with Andy the previous day and the defendants' confrontation with Andy at the Phan house provided an opportunity to plan the attack and to obtain a weapon. Moreover, when Len did join the other three defendants, the four conferred briefly.  Given the coordination between all four defendants over a 24-hour period and their conferring just before the attack, it would be highly unlikely that Si only communicated with Kiet about his plans.

Third, Kiet brought with him a gun when defendants went to the Phan house, which he immediately gave to Si, thus demonstrating that he and Si had previously communicated about the need for lethal force. But the jury was also entitled to infer from Nhat's presence with Si and Kiet in the car, and from Len's conference with the other defendants outside the Phan house before the shooting, that Nhat and Len also knew that Kiet had the gun. (See *People v. Godinez* (1992) 2 Cal.App.4th 492, 500, 3 Cal.Rptr.2d 325.) Indeed, it would be less reasonable to conclude that Nhat and Len had no idea that Si would be armed, despite the fact that the defendants had conferred right before the shooting and Si had started shooting seconds after the front door opened. That is, it would be less reasonable to believe that the four defendants would make plans to retaliate against Andy and go to the Phan house's front door, but that two of the four would not advise the other two what they had planned.

For this reason, Len's argument that "all of the evidence ... surrounding the shooting indicated that the gun appeared without warning right before Si began to shoot" actually undermines his claim that there was no premeditation. The speed with which the shooting was executed, and the coordination necessary to execute the plan so quickly (the handoff of the gun from Kiet to Si), created

a reasonable inference that the lethal attack on Andy had been planned.

Fourth, the likelihood that Len and Nhat were aware that Kiet or Si had a gun is bolstered by the fact that Si and Kiet had a large arsenal of weapons. The size of such an arsenal suggests that Len and Nhat had to be aware that the other two defendants possessed weapons. We thus reject Len's contention that "[n]one of the evidence of the events immediately preceding the shooting provided any basis for concluding that Len knew, or reasonably should have known, that one of his companions was armed, much less that Si intended to commit an assault with a firearm or a homicide."

Fifth, Nhat argues that his handling of the murder weapon after the shooting "appears to have been no more than an immediate reaction to an unfolding event, rather than any indication of prior agreement to participate in a killing," but the fact that Si would hand the gun to him suggests that he was part of the plan to kill Andy. Why would Si give the gun to someone not part of the conspiracy? Why not continue to carry the gun himself?

Sixth, Len and Nhat clearly had a motive to assist in the lethal attack on Andy. After all, it was Len's fight with Andy that precipitated the retaliation. Indeed, even Len concedes that "[i]t is reasonable to infer from this evidence that Len intended to engage in another round of combat with Andy." And Nhat had a motive as a fellow gang member to assist Si.

Seventh, all defendants were at the scene of the crime. Although, as noted, their mere presence would not, by itself, warrant a finding that they aided and abetted the shooting ( *People v. Campbell*, *supra*, 25 Cal.App.4th at p. 409, 30 Cal.Rptr.2d 525),FN22 it was evidence to be considered in determining whether defendants were guilty of aiding and abetting. ( *People v. Moore*, supra, 120 Cal.App.2d at p. 306, 260 P.2d 1011.)  Moreover, defendants did not just happen upon the crime scene by chance.  Rather, their collective presence in this case suggested that they intended to provide organized support for Si's attack on Andy.

> FN22. The jury was correctly instructed on this
> point pursuant to CALJIC No. 3.01.

Eighth, defendants' actions after the shooting demonstrate their consciousness of guilt, in that defendants fled together, hid together, and were picked up together. (See *People v. Williams* (1997) 55 Cal.App.4th 648, 652, 64 Cal.Rptr.2d 203 ( *Williams IV*) [generally, evidence that a defendant fled the scene of a crime is admissible evidence of his consciousness of guilt].) FN23 In addition, the trier of fact was entitled to conclude that by removing the murder weapon from the crime scene and initially hiding it,

Nhat intended to facilitate the crime by making it more likely that defendants would escape detection.

> FN23. The jury was instructed on this point with CALJIC No. 2.52.

Finally, there was the evidence of defendants' affiliation with MAC. The statements to police of Nhat, Si, and Si's girlfriend allowed the conclusion that Andy's shooting was gang-related. MAC, with which Nhat, Si, and Si's friends were affiliated, was unfriendly with those gangs with which Andy and his friends were believed to be affiliated.  Even mere acquaintances knew that relations between defendants, on the one hand, and Andy and his friends, on the other, were unfriendly.  In addition, the existence of these gang antagonisms and the arsenal of arms maintained by Si and Kiet made it more likely that a retaliation against a member affiliated with an unfriendly gang would be lethal. (Cf. *U.S. v. Garcia* (9th Cir.1998) 151 F.3d 1243, 1246 [Evidence of gang membership alone may not substitute for evidence of intent to establish liability for aiding and abetting where the facts do not demonstrate a coordinated effort with a specific illegal objective in mind].)

Len argues that "[t]he primary defect in the gang evidence is that it fails to show any previous conduct on the part of the gang or its members that would have alerted a reasonable person in Len's position to the likelihood that they would view Len's dispute with Andy Tran as an occasion calling for the use of lethal force."  Len also argues that there was no evidence indicating that Len knew Kiet or was aware of his arsenal of weapons.  But it is difficult to believe that Len would choose to contact Si for assistance against Andy but be wholly unaware of his gang affiliation or his possession or access to weapons.  It is also difficult to believe that although Len conferred with Si, Kiet, and Nhat before they went to the Phan house, Len had no idea that Kiet would hand Si a gun and that Si would start shooting within seconds after the front door was opened.

In light of the foregoing, we will not second-guess the jury. We conclude that there was substantial evidence from which a reasonable trier of fact could have found Len and Nhat guilty as aiders and abettors of Andy's murder.

**B. Defendants' Convictions for the Attempted Murder of Sen Dang Are Based on Substantial Evidence**

Defendants contend that the evidence was insufficient to support their convictions for the attempted murder of Sen Dang.  Kiet argues that "there was no direct evidence suggesting that the shooter had an intent to kill Sen Dang" and that "the circumstantial evidence proves only that Sen Dang was accidentally hit by a stray

17

bullet fired during the gun battle."

The Attorney General responds that "[g]iven the fact that Si fired at least five shots into the house, it is also inferable that [his] plan was not necessarily confined to killing Andy." Further, he argues that "even assuming that the other [defendants] intended only to kill or shoot Andy, they are still liable for attempted murder as aiders and abettors under the 'natural and probable consequences' doctrine."

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a; *People v. Toledo* (2001) 26 Cal.4th 221, 229, 109 Cal.Rptr.2d 315, 26 P.3d 1051; see 1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Elements, § 53, p. 262.) Accordingly, " ' "[s]pecific intent to kill is a necessary element of attempted murder. It must be proved, and it cannot be inferred merely from the commission of another dangerous crime." [Citation.]' [Citations.]" ( *People v. Swain* (1996) 12 Cal.4th 593, 605, 49 Cal.Rptr.2d 390, 909 P.2d 994; accord, *People v. Bland* (2002) 28 Cal.4th 313, 327-328, 121 Cal.Rptr.2d 546, 48 P.3d 1107 ( *Bland* ).)

Thus, to find Si guilty of attempted murder, the jury had to find that Si intended to kill Sen Dang. With respect to the other defendants, their "culpability for attempted murder as an aider and abettor necessarily depends on the commission of that crime by the perpetrator." ( *People v. Patterson* (1989) 209 Cal.App.3d 610, 614, 257 Cal.Rptr. 407; see *People v. Mendoza, supra*, 18 Cal.4th at p. 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.) As noted earlier, they must " 'act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*Mendoza*, at p. 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.) But "[o]nce the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense." ( *Ibid.*)

For purposes of our analysis of the sufficiency of the evidence for attempted murder, we will first focus on whether there was evidence upon which a rational trier of fact could conclude that Si intended to kill Sen Dang. The jury was correctly instructed with CALJIC No. 8.66 that express malice is a prerequisite to a verdict of attempted murder.

Nonetheless, the California Supreme Court has recently ruled in *Bland, supra*, 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107, that although the doctrine of transferred intent does not apply to attempted murder, "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently,

18

intended to kill others within what it termed the 'kill zone.' "
There, the defendant-a member of a gang-shot at three persons in a
vehicle, killing his target (a rival gang member who was driving)
and injuring, but not killing, the two passengers (who were not
gang members). The California Supreme Court upheld the
attempted murder convictions of the two passengers, which the
Court of Appeal had reversed. It found that "a person who shoots
at a group of people [can] be punished for the actions towards
everyone in the group even if that person primarily targeted only
one of them" (28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d
1107), that the intent to kill a particular target does not preclude
finding a concurrent intent to kill others within the "kill zone" (
*ibid.)*, and that "[t]his concurrent intent theory is not a legal
doctrine requiring special jury instructions such as is the doctrine
of transferred intent" but rather "is simply a reasonable inference
the jury may draw in a given case." (28 Cal.4th at p. 331, fn. 6, 121
Cal.Rptr.2d 546, 48 P.3d 1107.) It added that "a primary intent to
kill a specific target does not rule out a concurrent intent to kill
others." ( *Ibid.*) It then found in that case that "the evidence ...
virtually compelled a finding that, even if defendant primarily
wanted to kill [the gang member], he also, concurrently, intended
to kill the others in the car. At the least, he intended to create a kill
zone." ( *Id.* at p. 333, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)

On the basis of *Bland, supra*, 28 Cal.4th 313, 121 Cal.Rptr.2d 546,
48 P.3d 1107, we conclude that there was sufficient evidence for
the jury to conclude that Si possessed the requisite specific intent
to kill others within the kill zone necessary to shoot Andy.  After
all, he fired at least five shots into a crowded room.  Analogizing
the car with two passengers in Bland with the crowded room of
five people here, the jury was entitled to find that Si had a
concurrent intent to murder-and shot with knowledge that he would
kill-anyone who was near his target when he sprayed the room with
five gunshots.

We next turn to the sufficiency of the evidence supporting the
convictions of the other defendants as aiders and abettors.
"Accomplice liability is 'derivative,' that is, it results from an act
by the perpetrator to which the accomplice contributed."
(*Prettyman, supra*, 14 Cal.4th at p. 259, 58 Cal.Rptr.2d 827, 926
P.2d 1013.) "When the offense charged is a specific intent crime,
the accomplice must 'share the specific intent of the perpetrator';
this occurs when the accomplice 'knows the full extent of the
perpetrator's criminal purpose and gives aid or encouragement
with the intent or purpose of facilitating the perpetrator's
commission of the crime.' [Citation.]" ( *Ibid.*)

Admittedly, there was no direct evidence that the other defendants
knew that Si would spray the room with bullets in order to kill
Andy, thereby creating a "kill zone."

19

But there was sufficient evidence under the natural and probable consequences doctrine. The natural and probable consequences doctrine is "based on the recognition that 'aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion.' [Citation.]" ( *Prettyman, supra,* 14 Cal.4th at p. 260, 58 Cal.Rptr.2d 827, 926 P.2d 1013.) The test of natural and probable consequences is an objective one and " ' "depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." [Citation.]' [Citations.]" ( *People v. Culuko* (2000) 78 Cal.App.4th 307, 327, 92 Cal.Rptr.2d 789.)

A reasonable person would have foreseen that the reasonably foreseeable consequence of shooting into a crowded room to murder one person would be to murder any innocent bystander within the "kill zone." ( *Bland, supra,* 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) And clearly, the jury could reasonably infer that defendants were aware that there were a number of people at the Phan house, including Andy, who could be hit in the line of fire. Further, in light of the evidence that the attack on Andy was an aspect of gang warfare, "[t]he frequency with which ... gang attacks result in homicide" supported the foreseeability that an attempt to murder one person in an occupied home would result in the murder (or if they survived, the attempted murder) of others. (See *People v. Montano* (1979) 96 Cal.App.3d 221, 227, 158 Cal.Rptr. 47 [Defendant's conviction for attempted murder depended upon the determination that a codefendant's assault with intent to commit murder was a natural and probable consequence of an attack on rival gang member].) In short, if Si was properly convicted of the attempted murder of those within the kill zone pursuant to *Bland, supra,* 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, so, too, were his aiders and abettors since such a kill zone was the natural and probable consequence of the premeditated murder of Andy in a crowded room. This is but a direct application of the natural and probable consequences doctrine, which declares: " '[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets.' " ( *Prettyman, supra,* 14 Cal.4th at p. 261, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

Accordingly, there was sufficient evidence to support defendants' convictions for attempted murder.

People v. Tran, 2003 WL 21061575 at *20-*26; Findings and Recommendations, Case No. 2:04-CV-1829 GEB JFM, 11/13/09, at pp. 40-47.

\\\\\

20

1                    <u>Legal Standard - Sufficiency of the Evidence</u>

2              When a challenge is brought alleging insufficient evidence, federal habeas corpus

3   relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

4   most favorable to the prosecution, no rational trier of fact could have found "the essential

5   elements of the crime" proven beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307,

6   319, 99 S. Ct. 2781 (1979).  <u>Jackson</u> established a two-step inquiry for considering a challenge to

7   a conviction based on sufficiency of the evidence.  <u>U.S. v. Nevils</u>, 598 F.3d 1158, 1164 (9th Cir.

8   2010) (en banc).  First, the court considers the evidence at trial in the light most favorable to the

9   prosecution.  <u>Id</u>., citing <u>Jackson</u>, 443 U.S. at 319, 99 S.Ct. 2781.  "'[W]hen faced with a record of

10  historical facts that supports conflicting inferences," a reviewing court 'must presume–even if it

11  does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in

12  favor of the prosecution, and must defer to that resolution.'"  <u>Id</u>., quoting <u>Jackson</u>, 443 U.S. at

13  326, 99 S.Ct. 2781.

14             "Second, after viewing the evidence in the light most favorable to the prosecution,

15  a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

16  rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"  <u>Id</u>.,

17  quoting <u>Jackson</u>, 443 U.S. at 319, 99 S.Ct. 2781.  "At this second step, we must reverse the

18  verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact

19  finders would have to conclude that the evidence of guilt fails to establish every element of the

20  crime beyond a reasonable doubt."  <u>Id</u>.

21             Superimposed on these already stringent insufficiency standards is the AEDPA

22  requirement that even if a federal court were to initially find on its own that no reasonable jury

23  should have arrived at its conclusion, the federal court must also determine that the state

24  appellate court not have affirmed the verdict under the <u>Jackson</u> standard in the absence of an

25  unreasonable determination.  <u>Juan H. v. Allen</u>, 408 F.3d 1262 (9th Cir. 2005).

26  \\\\\

1     Legal Standard for Aiding and Abetting

2     "[A]n aider and abettor is a person who, acting with (1) knowledge
      of the unlawful purpose of the perpetrator, and (2) the intent or
3     purpose of committing, encouraging, or facilitating the commission
      of the offense, (3) by act or advice aids, promotes, encourages or
4     instigates, the commission of the crime." *People v. Prettyman*, 14
      Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013 (1996)
5     (citation and internal quotations omitted); see also *People v.*
      *Beeman*, 35 Cal.3d 547, 550-51, 199 Cal.Rptr. 60, 674 P.2d 1318
6     (1984). "When the offense charged is a specific intent crime, the
      accomplice must 'share the specific intent of the perpetrator'; this
7     occurs when the accomplice 'knows the full extent of the
      perpetrator's criminal purpose and gives aid or encouragement
8     with the intent or purpose of facilitating the perpetrator's
      commission of the crime.' " *People v. Prettyman*, 14 Cal.4th at
9     259, 58 Cal.Rptr.2d 827, 926 P.2d 1013 (citation omitted).

10    Ramirez v. Almager, 619 F.Supp.2d 881, 898 (C.D. Cal. 2008).

11          Respondent seeks to incorporate, adopt and rely on the prior analysis by Judge

12    Moulds as to this and all claims, maintaining that the claims of the instant petitioner are precisely

13    those previously raised by petitioner Nhat and rejected.  Answer, p. 6.  Respondent avers that to

14    do otherwise would not be in the interest of judicial economy because he asserts that the prior

15    findings and recommendations apply "in *every salient respect*" to the present claims [emphasis

16    by respondent].  Id.  Petitioner contends the majority of Judge Moulds' decision which relates to

17    the instant petitioner quotes the unpublished state appellate court opinion, maintaining that

18    "sufficient differences exist for the court to take an independent analysis of petitioner Len

19    Nguyen's claims."  Traverse, pp. 3 & n. 1.

20          Citing People v. Prettyman, supra, 14 Cal. 4th at 261, petitioner notes, as did the

21    state appellate court above, that the intent requirement has evolved into the natural and probable

22    consequences doctrine, focusing on the fact that "a defendant can only be guilty of crimes that

23    were the natural and probable consequence of the crime he actually *intended* to commit."  AP, p.

24    6 [emphasis by petitioner], citing Prettyman, at 260.  A murder or attempted murder conviction

25    for aiding and abetting, he asserts, requires "'substantial evidence'" that a defendant did intend

26    (1) to aid and abet the crime committed or (2) "to aid and abet a crime that by its nature posed the

1   risk of serious bodily injury or death," or (3) to commit or aid and abet another crime "and was

2   aware of circumstances which would have alerted a reasonable person to the likelihood of serious

3   bodily injury or death," even though the crime he intended to commit or aid and abet would not

4   ordinarily have such consequences.  AP, p. 6, citing id. at 261.  Petitioner argues on that basis

5   that even viewing the evidence in the light most favorable to the judgment, a rational trier of fact

6   could not have found petitioner intended to aid and abet the murder of Andy Tran or the

7   attempted murder of Sen Dang.  AP, p. 6.  Petitioner maintains that the following trial evidence:

8   that petitioner had fought with Andy Tran the day before the murder and had sought Si's

9   assistance; that Si had agreed to help petitioner in some fashion and that the visits the four co-

10   defendants paid to the Phan house on the afternoon before the murder and on the following day

11   was evidence only "sufficient to support a reasonable inference that petitioner intended to engage

12   Tran with his friends, which, at best suggests that petitioner intended to commit a misdemeanor

13   assault," but not that he "knew or should have known he was inviting the use of potentially lethal

14   force."  Id.

15         To demonstrate that identification of the target crime assists a jury's determination

16   of the applicability of the natural and probable consequences doctrine, petitioner analogizes to

17   Prettyman, 14 Cal. 4th at 267, 58 Cal.Rptr.2d 827,[7] wherein the California Supreme Court,

18   provided the example that if the jury concluded that while the defendant had encouraged a co-

19   defendant to commit an assault but that the defendant did not have any reason to believe that the

20   co-defendant would use a deadly weapon such as a steel pipe to commit the assault, the jury

21   could not properly determine that the murder of the victim was a natural and probable

22   consequence of the assault encouraged by the defendant.  AP, 6-7.  In that case, the court stated,

---

23

24        [7] Petitioner's citation to Prettyman (wherein these scenarios were indeed referenced, for
which the court has provided the accurate location) was actually to People v. Butts, 236 Cal.
App.2d 817, 836, 46 Cal. Rptr. 262 (Cal. App. 3rd Dist. 1965) (cited in Prettyman, 14 Cal. 4th at
25   262), wherein it was held that the victim's killing was held not to be the natural and probable
consequence of an assault when the defendant did not have knowledge that a companion would
26   make use of a deadly weapon).

1   with an instruction that "assault with a deadly weapon or by means of force likely to produce

2   great bodily injury [] as the appropriate target crime," if the jury drew that conclusion based on

3   the defendant's having encouraged the assault on the victim using the steel pipe or by means of

4   force likely to result in great bodily injury, it would be appropriate for a jury to find the victim's

5   murder to be the natural and probable consequence of the assault.  Prettyman, 14 Cal. 4th at 267,

6   58 Cal.Rptr.2d 827.

7          No evidence, petitioner argues, shows that petitioner knew that co-defendant Kiet

8   had a gun in his waistband before the shooting, but the evidence did show that petitioner was

9   younger than his three co-defendants; that petitioner approached the three co-defendants only

10  after the first school session was over, while the other three had come together by car and the gun

11  and ammunition came from the car; that while petitioner conferred with the other three briefly

12  before the four approached the house.  AP, pp. 7, 9; Traverse, p. 3, citing People v. Tran, 2003

13  WL[8] 21061575 at * 2 [, *21-*22].  Petitioner points out that Judge Moulds noted specifically the

14  evidence that Nhat was picked up by Si and arrived at the scene of the shooting in Si's car with

15  Si and Kiet, where the gun and ammunition came from and that the three sat outside and waited

16  at the scene as evidence of a shared intent.  Traverse, p. 3, citing Nguyen v. Kane, 2009 WL

17  3823962 at *34 (E.D. Cal.).  While Judge Moulds did note this evidence as indicative of a

18  "shared intent," he also noted that the three were waiting both for the victim to come home and

19  for petitioner herein to join them.  Id.  This could certainly give rise to a logical inference, despite

20  petitioner's argument, that petitioner was as involved as the other three, despite not arriving in

21  the same vehicle and particularly because it was petitioner who had been involved in the fight

22  with the victim, Andy, the day before and who turned to co-defendant Si after which the two

23  other co-defendants became involved in going after the victim.

24          Petitioner contends that it was unreasonable to infer from the conversation, as no

25

26          [8] Respondent cites to the Lexis citation, the undersigned will use the Westlaw citation.

1   evidence of its contents was provided, that petitioner knew that the victim "was in mortal

2   danger," calling any such inference, "'[s]peculation and conjecture'" which "'cannot take the

3   place of reasonable inferences and evidence" that petitioner "through both guilty mind and guilty

4   act- - acted in consort'" with co-defendant[s].  AP, p. 7-8, citing <u>Juan H. v. Allen</u>, 408 F.3d at

5   1279.[9]

6           Petitioner goes on to argue that with regard to the shooting itself, the evidence

7   showed that the shooter, Si, did not possess the gun when he walked in the house, but had to

8   receive it from Kiet, who had the gun concealed in his waistband.  AP, p. 8; see <u>People v. Tran</u>,

9   2003 WL 21061575 at *2.  Petitioner contends that if it were a premeditated gang-retaliation

10  murder, it would be very unlikely that the shooter would enter hostile territory unarmed, which

11  undercuts the reasonableness of any inference that petitioner had pre-arranged the shooting with

12  the other defendants.  Id.  Petitioner faults the state appellate court opinion as conclusory and

13  circular in determining that a reasonable person would have foreseen that it would be a

14  reasonably foreseeable consequence of shooting into a crowded room to murder one person to

15  murder any innocent bystander within the "kill zone," when no evidence showed petitioner knew

16  there would be any lethal weapon involved in the encounter.  Id.  Petitioner faults the sufficiency

17  of the "gang evidence," as a basis for proving petitioner's intent to aid and abet the posed the risk

18  of serious bodily injury or death because "[t]he 'gang' evidence consisted of the statement by

19  Nhat that he was a member of a gang called the 'Mafia Asian Crew'; of Detective Salsedo's

20  testimony that Si's girlfriend told him that 'Si and his friends' were members of the Mafia Asian

21  Crew [MAC]; and the statements that Nhat and Si that they might have problems in jail with

22  members of a gang to which Tran might have belonged."  AP, p. 8.  Petitioner finds this evidence

23  insufficient because it did not identify which of Si's friends were members of the MAC.  Id. at 8-

24  9.  While conceding petitioner and Si were friends as revealed by Si in his police interview,

25

26          [9] Not at 1277, as cited by petitioner.

25

1   petitioner maintains that there is no evidence to show that their association could have permitted

2   a reasonable fact trier to infer that petitioner was among the friends mentioned by Si's girlfriend

3   as a gang member or that petitioner even knew Si was a MAC gang member.  Id. at 9.  Not only

4   was petitioner several years younger than Si and his friends, petitioner contends, "[t]he only

5   evidence of the extent of petitioner's acquaintance with Si was Si's testimony that he knew

6   petitioner through his cousin Nhat."  Id.

7         Petitioner also argues that even if he were aware of Si's gang affiliations, People

8   v. Tran, 2003 WL 21061575 at *4, *23,  no evidence showed that the members of the group had

9   ever been involved in prior violent criminal activities, citing Juan H, 408 F.3d at 1278.  AP, p. 9.

10   Nor does petitioner concede that the court of appeal's inference from the arsenal evidently

11   possessed by Si and Kiet that this could have alerted petitioner to either having had a gun, based

12   on the evidence that the three co-defendants were older than petitioner, who was then a high

13   schooler, on Si's uncontradicted testimony that petitioner knew Si through petitioner's cousin,

14   Nhat, and that Si had met Kiet at Delta College and had only known him for a few months.  Id.,

15   citing RT 3233, 3238.  Petitioner maintains there was no evidence of a close association among

16   Si, Kiet and petitioner and none that would have supported a reasonable inference that he was

17   aware of the arsenal's existence.  Id.  Finally, petitioner disputes the inference of a consciousness

18   of guilt drawn by the state appellate court by the fact that all four defendants fled after the

19   shooting together, Tran, 2003 WL 21061575 at *23, in light of Si's having just fired a number of

20   shots in the Phan home because "[f]light was a likely response whether the shooting was planned

21   or unexpected."  AP, pp. 9-10, citing Juan H., 408 F.3d at 1277 ("[n]o reasonable trier of fact

22   could find evidence of criminal culpability in the decision of a teenager to run home from the

23   scene of a shooting, regardless of whether the home was in the same general direction as the car

24   of a fleeing suspect.").

25         The undersigned has set forth petitioner's argument in detail but nevertheless

26   finds as to this petitioner, as did Judge Moulds, in concluding that the evidence was sufficient

1   with respect to petitioner's co-defendant Nhat, that in "[v]iewing the evidence in the light most

2   favorable to the verdict, and for the reasons described by the California Court of Appeal," that

3   sufficient evidence existed "from which a rational trier of fact could have found beyond a

4   reasonable doubt that petitioner was guilty of the murder of Andy and the attempted murder of

5   Sen Dang." Nguyen v. Kane, 2009 WL 3823962 at *34 (E.D. Cal.) at * 34.

6   As he stated:

7           If the trier of fact could draw conflicting inferences from the
            evidence, the court in its review will assign the inference that
8           favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir.
            1994). The relevant inquiry is not whether the evidence excludes
9           every hypothesis except guilt, but whether the jury could
            reasonably arrive at its verdict. United States v. Mares, 940 F.2d
10          455, 458 (9th Cir.1991). Thus, "[t]he question is not whether we
            are personally convinced beyond a reasonable doubt" but rather
11          "whether rational jurors could reach the conclusion that these
            jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir.
12          1991). The federal habeas court determines sufficiency of the
            evidence in reference to the substantive elements of the criminal
13          offense as defined by state law. Jackson, 443 U.S. at 324 n.16;
            Chein, 373 F.3d at 983.

14

15  Id.

16          The problem for petitioner is not that some of the points he argues are not

17  plausible, it is simply that the argument does not meet his burden to show that the conflicting

18  inferences reached by the trier of fact were outside the range of what a reasonable fact trier could

19  conclude.   As the state appellate court determined, the evidence produced led to a number of

20  bases that support petitioner's conviction: the speed and effectiveness with which the victim was

21  killed indicated premeditation and deliberation by all four defendants; the evidence that all of the

22  defendants coordinated their plans over a 24-hour period in that when the victim was not at home

23  when all four tried to find him on the day of the fight between petitioner and the victim, the three

24  co-defendants waited for petitioner until a time when he would be available before approaching

25  the victim's house again the next day when the victim was there and all four conferred before the

26  attack; while Kiet brought the gun when the petitioner and his three co-defendants went to the

27

1  Phan house and gave it to Si immediately, showing those two had communicated previously

2  about the need for lethal force, the jury could infer from petitioner's having conferred with his

3  co-defendants before approaching and entering the Phan house before the shooting that he also

4  knew that Kiet had the gun; that it was likely petitioner (as well as Nhat) was aware that Kiet or

5  Si had a gun based on the evidence that Si and Kiet had a large store of weapons and that

6  petitioner and Si were friends; that petitioner had motive to assist in the lethal attack on the

7  victim since it was petitioner's fight which precipitated it.  People v. Tran, 2003 WL 21061575 at

8  *21-*22.  "Indeed, even Len [petitioner herein] concedes that '[i]t is reasonable to infer from this

9  evidence that Len intended to engage in another round of combat with Andy.'"  Id. at *22.  In

10  addition, although the fact of petitioner's presence at the scene of the crime is not enough for a

11  finding that he aided and abetted the shooting, it was evidence that could legitimately be

12  considered in determining whether he aided and abetted that crime, and, in any event, the

13  presence of all four defendants together suggested that they were working together toward the

14  same end.  Id.  The evidence of co-defendants Nhat and Si's (and Si's friends) MAC gang

15  affiliation and of that gang's unfriendliness toward the victim and his friends, along with the

16  arsenal possessed by Si and Kiet would tend to lead to the inference that retaliation against a rival

17  gang member would be deadly.  Id. at *23.

18         The Court of Appeal first expressly found that Len shared the intent of Si with

19  respect to the premeditated murder of Andy and the attempted murder of Sen Dang.[10]  The

20  undersigned is convinced that the first circumstance found by the Court of Appeal, the speed

21  with which the gun was produced and Andy was shot, is by far the most important and the *sine*

22  *qua non* for the sufficiency of the evidence in terms of whether "fair minded jurists" could find

23  as did the Court of Appeal.  Almost immediately after entering the house, Si was challenged by

24  Cuong Phan – but Si did not shoot at Cuong Phan, he swiftly looked for and shot Andy, his

25  
26         [10] Si did not contest on appeal the sufficiency of the evidence with respect to his
    conviction for the first degree murder of Andy.

28

obviously intended target.  This circumstance strongly suggests of the deliberated plan by *all* defendants to get on with the intended business of killing Andy straight away.  Otherwise, petitioner would have to argue that the meeting just before the home invasion was one where Si, who conceded on appeal the sufficiency of the evidence with respect to his premeditated plan, told or intimated to petitioner and Nhat – trust us (Si and Kiet), we have a plan to deal with Andy, but we are not going to tell you what it is.  Of the inferences that can be drawn from this circumstance, petitioner's is by far the less likely.

The remaining circumstances, neither by themselves or collectively would pass muster as sufficient.  Indeed most are heavily speculative, e.g., petitioner must have known [in the absence of any evidence] about the large arsenal of weapons possessed by Si and Kiet simply by virtue of the fact that there has been some pre-murder association.  Or, because the defendant fled together after the shooting, it is more likely that all had participated in a pre-murder plan. However, while not sufficient themselves, they are additive somewhat to the first strong inference of intent that the first circumstance gives.

For whatever reason, the Court of Appeal did not consider the alternative theory that even if the initial idea of all four defendants was to engage in a home invasion assault of Andy, the evidence was strong that petitioner certainly shared the intent to commit a home invasion type felony assault on Andy – there could have been no other reason for the four defendants to invade the home where Andy was present.  And the jury was instructed on the natural and probable consequences doctrine applicable to aide and abettor liability.  That is:

> One who aids or abets the other in the commission of the crime or crimes is not only guilty of those crimes but is also guilty of any other crime committed by a principal which is a natural or probable consequence of the crime or crimes originally aided or abetted.
>
> You must determine whether a defendant is guilty of the crimes originally contemplated and, if so, whether the crimes charged in Counts 1 and 2 were a natural and probable consequence of the originally contemplated crime.

RT 3852 (jury instruction)[11]

In the context of aiding and abetting the lesser crime of assault with the resultant murder, it would be unreasonable for petitioner to assume that none of his cohorts were armed despite their determination to enter a home, one way or another, for the purpose of wreaking bodily harm on an occupant therein.  Home invasions can be dangerous to those who commit the invasion as homeowners can easily have access to self-defense weapons within their home.[12] That is, the fact of intending to commit an assault *after invading a home* exponentially increases the risk that one of the attackers will be armed and ready to shoot at the slightest provocation because that is the nature of the circumstances in which the attackers place themselves, i.e. it is likely that the attackers may be facing deadly force themselves.  It is easily reasonably foreseeable and a natural and probable consequence of a home invasion for the purpose of assault that the assault violence will soon escalate to deadly violence.  And, in this case, the facts demonstrate that the residents in the house were not prepared to just lie down in the face of the initial entry – the attackers were immediately challenged by the residents, and the force used by the attackers went from assault to deadly force in a matter of seconds.[13]

While the necessary intent for attempted murder (as opposed to the murder) is of a higher and more specific nature, the undersigned cannot say that fair minded jurists could not

---

[11] Perhaps the Court of Appeal did not consider this theory because the target offense was not specified.  See infra.  However, the jury was instructed on the natural and probable consequence theory and could easily have thought the target offense agreed upon by the defendants was a home invasion type assault.

[12] The undersigned has no problem in terming the context of the assault here as a "home invasion."  Planning an assault by entering a home either by pushing onself into the home, or entering after a confused or overwhelmed resident lets the attacker cross the threshold, constitutes a home invasion for the purpose of analysis here.

[13] If the assault here were simply one planned for the street whenever and wherever Andy happened to be found, the inference that one of the assaulters would be armed for the assault, where the attackers greatly outnumbered the hapless victim, thereby leading to a conclusion that a shooting murder was the natural and probable result of the assault, would be much more tenuous.

1   agree with the Court of Appeal's "kill zone" analysis.

2

3         Claim 2:  Due Process violation for trial court's failure to identify and define the "target offenses"

4         In claim 2, petitioner contends that the trial court's failure to identify and define

5   "target offenses" under the natural and probable consequences doctrine violated his due process

6   rights, noting that the state court of appeal found this omission erroneous, but did not find the

7   error to be unconstitutional, a finding with which petitioner takes issue.

8         The state appellate court reasoned as follows:

9   **A. Failure to Instruct on Target Crimes Was Not Reversible Error**

10

11   Defendants complain that the trial court's instruction on the natural and probable consequences doctrine "did not either identify the target crime or define its elements." They argue that "the failure to

12   specify and define the target offense(s) violates the federal [C]onstitution if there is a reasonable likelihood that the jury relied

13   on the 'natural and probable consequences' instruction to find the defendant[s] guilty of a crime such as murder on the basis of

14   conduct which would not naturally and probably lead to the commission of that crime."

15

16   We agree that the trial court failed to identify the target crimes, but any error was harmless.

17   As noted earlier in this opinion, "a person who aids and abets a confederate in the commission of a criminal act is liable not only

18   for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a 'natural and

19   probable consequence' of the crime originally aided and abetted." ( *Prettyman, supra*, 14 Cal.4th at p. 254, 58 Cal.Rptr.2d 827, 926

20   P.2d 1013.)  "To convict a defendant of a nontarget crime as an accomplice under the 'natural and probable consequences'

21   doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing,

22   encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the

23   commission of the target crime.  The jury must also find that the defendant's confederate committed an offense other than the target

24   crime, and that the nontarget offense perpetrated by the confederate was a 'natural and probable consequence' of the target crime that

25   the defendant assisted or encouraged." ( *Ibid.*)

26   Although the jury need not unanimously agree on the target crime

that the defendant aided and abetted, its members each "must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a criminal act, and that the offense actually committed was a natural and probable consequence of that act....  [A] conviction may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct.  To ensure that the jury will not rely on such generalized beliefs as a basis for conviction, the trial court should identify and describe the target or predicate crime that the defendant may have aided and abetted." ( *Prettyman, supra*, 14 Cal.4th at p. 268, 58 Cal.Rptr.2d 827, 926 P.2d 1013, fn. omitted.)

Such identification of the target crime "facilitate[s] the jury's task of determining whether the charged crime allegedly committed by the aider and abettor's confederate was indeed a natural and probable consequence of any uncharged target crime that, the prosecution contends, the defendant knowingly and intentionally aided and abetted." ( *Prettyman, supra*, 14 Cal.4th at p. 267, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

However, although the erroneous failure to identify and define the potential target offenses renders the instruction ambiguous, the error is not grounds for reversal under the federal Constitution unless there is a reasonable likelihood the jury " misappl[ied] the doctrine" ( *Prettyman, supra*, 14 Cal.4th at pp. 272-273, 58 Cal.Rptr.2d 827, 926 P.2d 1013; *People v. Lucas* (1997) 55 Cal.App.4th 721, 731, 64 Cal.Rptr.2d 282) or, for purposes of state law, unless it is reasonably probable the trial outcome would have been different absent the error ( *id.* at p. 274, 64 Cal.Rptr.2d 282).

In this case, the jury was instructed in partial compliance with the 1992 revision of CALJIC No. 3.02 (1992 rev.) (5th ed.1988) as follows: "One who aids and abets the other in the commission of the crime or crimes is not only guilty of those crimes but is also guilty of any other crime committed by a principal[,] which is a natural and probable consequence of the crime or crimes originally aided and abetted. [¶] You must determine whether a defendant is guilty of the crimes originally contemplated[,] and, if so, whether the crimes charged in Counts 1 and 2 were a natural and probable consequence of the originally contemplated crime." FN25

> FN25. Although the 1992 version was endorsed in *Prettyman* as a correct model ( *Prettyman, supra*, 14 Cal.4th at p. 268 & fn. 8, 58 Cal.Rptr.2d 827, 926 P.2d 1013), the variation given by the trial court did not identify the target crime and was abbreviated in the same fashion as the 1988 version (while nonetheless using the language of the first paragraph of the 1992 version). The currently recommended text of CALJIC No. 3.02 (2000 re-rev.) (6th ed.1996) has been expanded and states in relevant

part (brackets, parentheses and blanks in original): "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶] In order to find the defendant guilty of the crime[s] of _____, [as charged in Count[s] _____,] you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime [or crimes] of _____ [was] [were] committed; [¶] 2. That the defendant aided and abetted [that] [those] crime[s]; [¶] 3. That a co-principal in that crime committed the crime[s] of _____; and [¶] (4) The crime[s] of _____ [was] [were] a natural and probable consequence of the commission of the crime[s] of _____. [¶] [You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of _____ (charged crime) was a natural and probable consequence of the commission of that target crime]. [¶]...."

The instructions neither identified nor defined the potential target offenses.  FN26 Defendants' objection to the instruction was timely.

> FN26. The instruction originally proposed by the prosecution identified assault with a deadly weapon as the target offense, in contemplation of the court permitting the prosecution to amend the information to add a count charging all defendants with that offense.  But defense counsel objected to the instruction.  And the trial court denied the prosecutor's motion to amend.  No new definition of a target offense was proposed by the parties.

But the failure to specify a target crime was not prejudicial because there is little likelihood that the jury would have misapplied the doctrine. In *Prettyman, supra*, 14 Cal.4th 248, 58 Cal.Rptr.2d 827, 926 P.2d 1013, our Supreme Court explained that the failure to identify and describe the target crime created a risk that the target was based on noncriminal nefarious conduct ( *id*. at p. 268, 58 Cal.Rptr.2d 827, 926 P.2d 1013) or "that the jury might engage in unguided speculation" and misapply the instruction ( *id*. at p. 272, 58 Cal.Rptr.2d 827, 926 P.2d 1013).  But in this case, there was no reasonable likelihood that the jury misapplied the doctrine for three

33

reasons.

First, there was no risk that the jury relied on noncriminal behavior as the target offense, notwithstanding defendants' contentions that the jury might have done so. The trial court instructed the jury to determine whether the crimes charged "were a natural and probable consequence of the originally contemplated crime." (Italics added.) Thus, the jury would not have applied noncriminal behavior as the basis for such a finding. (See *Prettyman, supra,* 14 Cal.4th at p. 273, 58 Cal.Rptr.2d 827, 926 P.2d 1013.) Although defendants argue that the jury might have relied on "gang retaliation" as the target offense, as suggested by the prosecutor, the only such retaliation here would have been a criminal act-an assault upon Andy. Thus, we are confident the jurors would have relied on a crime as the target offense. We hasten to add that in the context of gang rivalry, courts have had little difficulty in concluding that assaults can naturally and reasonably foreseeably escalate into a shooting, regardless of whether any particular defendant knew the principal intended to use a gun. ( *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055-1056, 88 Cal.Rptr.2d 482; see *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10, 104 Cal.Rptr.2d 247.)

Second, having found defendants guilty of the first degree murder of Andy, it is highly improbable that the jury would have based the originally contemplated (target) crime on anything other than that offense. (Cf. *People v. Montano, supra,* 96 Cal.App.3d at pp. 225-227, 158 Cal.Rptr. 47.) That, after all, was the only other crime found by the jury against defendants. Under the circumstances here, with Si's shooting in a crowded room with the intent to kill Andy, it seems obvious that the attempted murder of Sen Dang was necessarily the natural and probable consequence of the first degree murder of Andy.

Finally, as for any potential misapplication of CALJIC No. 3.02 to the murder of Andy, it is highly unlikely that the jury found that Andy's premeditated and deliberate murder itself was the natural and probable consequence of any target crime, including assault (although it legally could have in the context of gang rivalries ( *People v. Montes, supra,* 74 Cal.App.4th at pp. 1055-1056, 88 Cal.Rptr.2d 482)) because the jury was instructed that it should use simple assault only as a lesser included offense for attempted murder and the murder happened much too quickly for the jury to view the murder as a natural escalation of any assault.

This case is distinguishable from *People v. Hickles* (1997) 56 Cal.App.4th 1183, 66 Cal.Rptr.2d 86, cited by Len and Nhat. There, "the conflicts in the evidence were such that it [could not] be said the only target offense shown by the evidence was one that would support a murder conviction under the natural and probable consequences doctrine." ( *Id.* at pp. 1195-1196, 66 Cal.Rptr.2d 86.) In contrast, here, the jury's verdict shows that it determined that

> defendants had premeditatedly and deliberately intended to kill Andy, and the wounding of Sen Dang was necessarily the natural and probable consequence of shooting in a crowded room to kill Andy.
>
> Accordingly, we do not believe that there is a reasonable likelihood that the jury misapplied the doctrine.  Nor is it reasonably probable that the trial's outcome would have been different in the absence of the trial court's instructional error.  (*Prettyman, supra*, 14 Cal.4th at p. 274, 58 Cal.Rptr.2d 827, 926 P.2d 1013; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836, 299 P.2d 243.)

People v. Tran, 2003 WL 21061575 at *26-*29; Nguyen v. Kane, 2009 WL 3823962 at *7-*10 (E.D. Cal.)

Legal Standard

A challenge to jury instructions does not generally state a federal constitutional claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475 (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."  Estelle v. McGuire, 502 U.S. at 68, 112 S.Ct. at 480.  In order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at 73, 112 S.Ct. at 482.  The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S.Ct. at 482.

Where what is at issue is the failure to give an instruction, petitioner's burden is "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737 (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240

(9th Cir. 1984).  Failure to give a jury instruction under these circumstances will not amount to a due process violation.  Id.

The burden upon petitioner is greater yet in a situation where he claims that the trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal claim whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to violate due process, the impact on the proceeding from failure to give an instruction sua sponte must be of a very substantial magnitude.

Furthermore, the Supreme Court has recently held that there is no unreasonable application of federal law where a state appellate court decided that a jury instruction's single incorrect statement of the "imperfect self-defense" standard did not render the instruction reasonably likely to have misled the jury.  Middleton v. McNeil, 541 U.S. 433, 124 S. Ct. 1830 (2004).

Discussion

As set forth in Magistrate Judge Moulds' Findings & Recommendations:

The trial court instructed the jury on aiding and abetting and liability for natural and probable consequences, as follows:

AIDING AND ABETTING-DEFINED

A person aids and abets the commission or attempted commission of a crime when he or she,
1. With knowledge of the unlawful purpose of the perpetrator and
2. With the intent or purpose of committing or encouraging or facilitating the commission of the crime; and
3. By act or advice aids, promotes, encourages or instigates the commission of the crime.

A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime.

> Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.
>
> Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.
>
> PRINCIPALS-LIABILITY FOR NATURAL AND PROBABLE CONSEQUENCES
>
> One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime or crimes originally aided and abetted.
>
> You must determine whether a defendant is guilty of the crimes originally contemplated, and if so, whether the crime charged in Counts I or II were a natural and probable consequence of the originally contemplated crime. (CT 1348-49.)

People v. Tran, 2003 WL 21061575 at *10-*11.

As Judge Moulds observed, the state court of appeal found that the record reflected that petitioner entered the Phan home with two or three with the understanding that they were to assault the victim.  Id. at *11.

> As explained by the California Court of Appeal, the instruction on "natural and probable consequences" did not instruct the jury that it must find a certain mental state if the specified factors were proven. Rather, the thrust of the instruction was that the jury could not render a guilty verdict unless the specified factors were established. The instruction merely allows, but does not require, the jurors to make a guilty finding if they found the underlying factors true. It did not instruct the jurors to infer intent or any other element of the crime charged against petitioner. This court also notes that petitioner's jury was instructed that a defendant could not be found guilty unless the prosecution proved him guilty beyond a reasonable doubt. (CT at 1346.) Accordingly, the instructions at petitioner's trial, considered together, did not permit a rational juror to believe that intent could be found without proof by the prosecution of all elements beyond a reasonable doubt.
>
> Petitioner appears to be arguing that he was denied due process because the instruction on "natural and probable consequences" allowed the jurors to convict him of murder or attempted murder even though they may have found that he did not act with the requisite intent to aid and abet those crimes. However, the jury

1  instructions belie that assertion. If the jury believed petitioner's
   testimony/defense, then it could not have found him guilty of
2  aiding and abetting assault under the instructions given. The
   instructions required the jury to find, among other elements, that
3  petitioner: (1) had knowledge of Len's[14] unlawful purpose, (2) had
   intent to encourage or facilitate the commission of the crime, and
4  (3) aided, promoted or encouraged (by act or advice) the
   commission of the crime. (CT at 1348.) Therefore, the guilty
5  verdict unambiguously indicates that the jury concluded petitioner
   intended to encourage or facilitate the commission of the target
6  crime. See Solis v. Garcia, 219 F.3d 922, 927-28 (9th Cir.2000).

7  Nguyen v. Kane, 2009 WL 3823962 at *11-*12.

8           It is petitioner's argument that the failure to identify the target offense specifically

9  left the jury without guidance from the trial court leaving inappropriate guidance from the

10 prosecutor "who in argument asserted repeatedly that the target offense was 'gang retaliation'

11 and that murder is the natural and probable consequence of gang retaliation." AP, p. 12.  The

12 heart of petitioner's argument is that had the target offense been explicitly defined, the jury could

13 have found petitioner guilty of having encouraged his co-defendants to commit an assault on the

14 victim but also found that petitioner had no reason to believe his co-defendants would use a

15 deadly weapon, such that the victim's murder could not have been found to have been a natural

16 and probable consequence of petitioner's having encouraged an assault.  AP, p. 13.  Petitioner

17 cites Hickles, 56 Cal. App.4th at 1197-98, which the state appellate court sought to distinguish

18 from the circumstances of this case, which in turn cites Prettyman, 14 Cal.4th at 267:

19          [I]t is not obvious a jury of laypersons, lacking instruction on target
            offenses, would not have viewed murder as a natural and probable
20          consequence of a simple assault or even an argument, perhaps on a
            generalized view that things can get out of hand in such
21          altercations.

22 In Hickles, the state appellate court reversed a conviction for aiding and abetting a second degree

23 murder because the failure of the trial court to instruct on the target offense gave rise to "a

24 reasonable likelihood" of misapplication by the jury of "the natural and probable consequences

25

26          [14] Len is petitioner in the instant action.

instruction to allow conviction based upon a target offense that either was not criminal or could not properly be found to have murder as a natural and probable consequence."  56 Cal. App.4th at 1198.

Petitioner finds circular the reasoning that the Court of Appeal employed in not finding constitutional error because, he insists, that court relied on the verdict that petitioner maintains was infected with the precise error of which petitioner is complaining.  Id. at 14.  The appellate court did this because it assumed that all involved had the intent to commit a crime that posed the risk of serious bodily injury or death because of the reference to gangs.  Id.  Petitioner avers that there was no evidence that he was in a gang, knew Si was in a gang, other than having been referred to as a friend by Si, or even that the gang with which Si was associated had ever been involved in acts of violence.  Id.  Petitioner argues again that no evidence demonstrated that petitioner had knowledge of any weapon or the possible use of lethal force and, while conceding that an assault would have been a crime, that the evidence tended to show only an intent to commit a simple assault, not one in which a shooting could have been a natural and probable consequence.  Id.

But perhaps the most salient point to assess the AEDPA  "reasonableness" of the Court of Appeal's determination that sufficient aider and abetter evidence existed with which petitioner could be found liable for aider and abettor murder is the fact that petitioner was not involved in a simple assault, but in an assault in the context of a home invasion.  As found by the Court of Appeal, it is simply untenable that the jury would have based an aiding and abetting murder verdict on a target action that was non-felonious in nature.

Nor does petitioner ultimately meet his burden to show a violation of federal due process by the court's erroneous failure sua sponte under state law rules to explicitly set forth the target crime, particularly where petitioner makes no showing that he requested any such an instruction himself.  See James v. Reece, 546 F.2d at 327 (in context of failing to give lesser included offense instruction in non-capital cases, such failure does not state a federal claim).  Nor

1    has petitioner shown that the error in failing to give the instruction sua sponte was of a very

2    substantial magnitude.  Simply because it was not in evidence that petitioner himself was a gang

3    member would not of itself make a jury's having concluded that the crimes murder and attempted

4    murder were a form of gang retaliation of which petitioner was an aider and abettor beyond a

5    reasonable doubt when he was the one who involved at least one or two members of a gang

6    hostile to the victim and his affiliations in a confrontation with him.  It was not an unreasonable

7    application of established Supreme Court authority for the jury to conclude that the murder and

8    attempted murder were a natural and probable consequence of petitioner's actions, that is, it was

9    not unreasonable to conclude that petitioner was guilty of aiding and abetting a crime far more

10   serious than simple assault when the record shows that it was petitioner who set the events in

11   motion and actively participated in, if not engineered, himself and his co-defendants entering the

12   Phan home to retaliate against the victim for a perceived injury that occurred the day before.

13              Claim 3: Prosecutorial Misconduct in Violation of Due Process

14              Petitioner contends that the prosecutor's remarks both during trial and in closing,

15   "'so infected the trial with unfairness as to make the resulting conviction a denial of due

16   process."  AP, p. 15, quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868

17   (1974).[15]  Petitioner also likens his case (id.) to one in which a pattern of prosecutorial

18   misconduct so infected the integrity of the proceeding that habeas relief is warranted even if the

19   jury's verdict was not substantially influenced by the misconduct, citing Brecht v. Abramson,

20   507 U.S. 619, 638 n. 9, 113 S. Ct. 1710 (1993), superseded by AEDPA on other grounds, it was

21   noted that "in an unusual case, a deliberate and especially egregious error of the trial type, or one

22   that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the

23   proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the

24

25              [15] In Donnelly, supra, at 640-645, 94 S. Ct. 1868, the Supreme Court did not find that the
     prosecutor's improper remark about a defendant's motives for going to trial did not render
26   defendant's "trial so fundamentally unfair as to deny him due process."

jury's verdict."   Brecht, 507 U.S. 619, 638 n. 9, 113 S. Ct. 1710 (1993), referencing cf. Greer v.

Miller, 483 U.S. 756, 769, 107 S, Ct. 3102, 3110 [] (1987)(Stevens, J., concurrence).

Legal Standard

The United States Supreme Court has long asserted "that the touchstone of due

process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

culpability of the prosecutor."   Smith v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940 (1982).   The

Ninth Circuit has set forth the applicable standard for prosecutorial misconduct claims:

> In evaluating the petitioners' allegations of prosecutorial
> misconduct on a writ of habeas corpus, *Darden v. Wainwright*
> instructs us that "it 'is not enough that the prosecutors' remarks
> were undesirable or even universally condemned[,]' [t]he relevant
> question is whether the prosecutors' comments 'so infected the
> trial with unfairness as to make the resulting conviction a denial of
> due process.' " 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144
> (1986) (citations omitted). In other words, under *Darden*, the first
> issue is whether the prosecutor's remarks were improper and, if so,
> whether they infected the trial with unfairness.

 Tak Sun Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir.2005).

Petitioner maintains that the prosecution 1) failed to provide timely discovery

(AP, p. 15-16, citing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963)); 2) engaged in

improper questioning of witnesses (AP, pp. 17-18); and 3) made improper arguments to the jury

(AP, pp. 18-22).

The state appellate court set forth, inter alia, the following with respect to

prosecutorial misconduct legal standards:

> The applicable federal and state standards regarding prosecutorial
> misconduct are well established.
>
> Improper remarks by a prosecutor can " 'so infect[ ] the trial with
> unfairness as to make the resulting conviction a denial of due
> process.' " ( *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91
> L.Ed.2d 144, 157]; *Donnelly v. DeChristoforo* (1974) 416 U.S.
> 637, 643 [40 L.Ed.2d 431, 437]; *People v. Frye* (1998) 18 Cal.4th
> 894, 969, 77 Cal.Rptr.2d 25, 959 P.2d 183 ( *Frye* ).)
>
> But conduct by a prosecutor that does not render a criminal trial

41

fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' [Citation.]" ( *People v. Gionis* (1995) 9 Cal.4th 1196, 1215, 40 Cal.Rptr.2d 456, 892 P.2d 1199; *People v. Hill* (1998) 17 Cal.4th 800, 819, 72 Cal.Rptr.2d 656, 952 P.2d 673 ( *Hill* ).) "The defendant generally need not show that the prosecutor acted in bad faith or with appreciation of the wrongfulness of his or her conduct, because the prosecutor's conduct is evaluated in accordance with an objective standard." ( *People v. Bradford* (1997) 15 Cal.4th 1229, 1333, 65 Cal.Rptr.2d 145, 939 P.2d 259 (*Bradford II* ).)

*32 "Nevertheless, as a general rule, to preserve a claim of prosecutorial misconduct, the defense must make a timely objection and request an admonition to cure any harm." ( *Frye, supra*, 18 Cal.4th at p. 969, 77 Cal.Rptr.2d 25, 959 P.2d 183; *People v. Monteil* (1993) 5 Cal.4th 877, 914, 21 Cal.Rptr.2d 705, 855 P.2d 1277 [although trial counsel objected to prosecutor's remarks at trial, the failure to request an admonition failed to preserve a claim of prosecutorial misconduct on appeal]; *People v. Gionis, supra*, 9 Cal.4th at p. 1215, 40 Cal.Rptr.2d 456, 892 P.2d 1199.)

The rule that a defendant must object and request an admonition at trial in order to preserve the issue for appeal, however, "applies only if a timely objection or request for admonition would have cured the harm." ( *People v. Hamilton* (1989) 48 Cal.3d 1142, 1184, fn. 27, 259 Cal.Rptr. 701, 774 P.2d 730.) Accordingly, the rule is not applicable where any objection by defense counsel would almost certainly have been overruled. ( *Ibid.*) Likewise, where such an objection is overruled, failure to request an admonition is excused because there is no opportunity to do so. (*People v. Green, supra*, 27 Cal.3d at p. 35, fn. 19, 164 Cal.Rptr. 1, 609 P.2d 468.)

People v. Tran, 2003 WL 21061575 at *31-*32.

1) *Failure to Provide Discovery Timely*

Petitioner argues that the prosecutor, from the beginning of trial proceedings, failed to conform with accepted conduct standards or to comply with the trial court's specific orders, giving as an example the prosecutor's failure to turn over impeachment materials by April 16, 2007, despite having been ordered, on March 11, 1997, to review juvenile records to determine evidence of offenses of moral turpitude committed by prosecution witnesses, discoverable under Brady, supra. AP, pp. 15-16, cting RT 52, 709. Petitioner maintains he was

1   prejudiced because defense counsel was not given enough time to prepare an adequate cross-

2   examination, despite having been granted a short continuance, by the prosecution's having only

3   turned over impeachment evidence as to prosecution witnesses, Philip Nguyen and Amee Her,

4   just before he called them to the stand, for which delay the court reprimanded the prosecutor in

5   chambers.  AP, p. 16, citing RT 1741-1742, 1750-1756, 1758, 1771, 1773, 1795, 1812.

6            Petitioner also faults the prosecutor for having stated, on March 11, 1997, that he

7   would use non-testifying co-defendants' statements, but nevertheless did not turn in his last

8   redactions until April 22, 1997, weeks after the jury had been sworn in on March 26, 1997.  AP,

9   p. 16, citing RT 25-26, 1085.  Even so, the redactions were unacceptable to the judge who ended

10   up redacting them himself, following much discussion and final versions were not available until

11   May 16, 2007, long after the jury was sworn in.  Id., citing RT 1148, 1987, 2255-2256.

12            Petitioner puts the loss of ten full days of testimony, and portions of, at a

13   minimum, three other days, squarely at the feet of the prosecutor and his "recalcitrant behavior,"

14   requiring jurors to be sent home with nothing or almost nothing accomplished.  AP, 16.  These

15   delays, according to petitioner, would have been unnecessary had the prosecutor behaved

16   professionally.  Id.  Petitioner believes that it is very likely the defendants were blamed for the

17   delays by the jury because no information was provided to them about the cause of the delays,

18   except that the trial court gave the jury reason to attribute the problems to "one side," without

19   more.  Id., citing RT 2251.  According to petitioner, because the delays meant the defense could

20   not challenge incriminating testimony for some time, the jurors were left with unchallenged

21   incriminating testimony for days; petitioner contends these delays were wholly attributable to the

22   prosecutor's misconduct entitling him to habeas relief, under Brecht, for having infected the

23   integrity of the proceeding even if concededly they did not "substantially influence" the verdict.

24   AP, p. 16, citing Brecht, 507 U.S. at 638 n. 9, 113 S. Ct. 1710.

25            Discussion

26            As to the contention that the prosecution failed to provide timely

discovery, the state appellate court made the following analysis:

[] The alleged failure to provide timely discovery.

[19]  During the trial, the court ordered disclosure to defendants of reports underlying the juvenile adjudications of certain prosecution witnesses. Trial proceedings were then continued for a week so that defense counsel could review the materials and so that the prosecutor would not be required to call witnesses out of order.

On appeal, defendants contend that the prosecutor's "uncooperative and dilatory" approach to his duty to disclose this impeachment evidence to defense counsel constituted misconduct, in that it constituted "an intentional effort to mislead and disrupt the defense throughout trial, and resulted in significant disruption of the trial." They also argue that it "had the effect of keeping the defense-and the trial court-off balance during much of the prosecution's case in chief."

The Attorney General disputes that the prosecutor intentionally disregarded court orders regarding discovery and argues that if any discovery-related delays disrupted the trial, there was no prejudice.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady v. Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215] (*Brady*); see *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1379, 66 Cal.Rptr.2d 494.) "Evidence is material under *Brady* if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*U.S. v. Alvarez* (9th Cir.1996) 86 F.3d 901, 904, citing *United States v. Bagley* (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481, 494].)  Impeachment evidence falls within the *Brad*y rule. (*United States v. Bagley, supra*, 473 U.S. at p. 676 [87 L.Ed.2d at p. 490].)

However, defendants identify no material impeachment information that was suppressed or withheld.  And nothing in the record suggests that the result of the proceeding would have been different had defendants' access to certain impeachment materials occurred sooner.

Provided the disclosure of impeachment materials is made at a time when it is of value to the accused-for example, in time to permit defendants to prepare for an examination of a witness-the defense is not prejudiced. (*U.S. v. Aichele* (9th Cir.1991) 941 F.2d 761, 764 ["When a defendant has the opportunity to present impeaching evidence to the jury, as [defendant] did here, there is no prejudice in the preparation of his defense"]; see also *People v.*

1

> *Pinholster*, supra, 1 Cal.4th at pp. 940-941, 4 Cal.Rptr.2d 765, 824 P.2d 571.)

2

3

> Defendants here do not dispute that they received the impeachment materials at issue in advance of their examination of the witnesses; thus, there was no prejudice.

4

5   People v. Tran, 2003 WL 21061575 at *33-*34.

6       With regard to petitioner's allegations of prosecutorial misconduct arising from

7   delays, the state appellate court had the following to say:

8

> [] Delays.

9

> [21]  Len complains that the prosecutor was responsible for various delays because of failures to timely provide impeachment and other evidence, and the need to debate redactions and the permissible scope of impeachment. But Len also admits that the continuances granted by the court were "undoubtedly necessary to preserve defendants' rights to a fair trial," that "he cannot conclusively prove that the prosecutor's delaying tactics were the cause of his conviction," and that it is speculative to suggest that the delays adversely affected the jury's deliberations.

10

11

12

13

14

> The nature of this claim and Len's concessions demonstrate that it is not reasonably probable that a result more favorable to defendants would have occurred had there not been such delays. (*People v. Bolton* (1979) 23 Cal.3d 208, 214, 152 Cal.Rptr. 141, 589 P.2d 396.) We therefore reject this claim. []

15

16

17   People v. Tran, 2003 WL 21061575 at *34.

18       Although petitioner makes claims of having been prejudiced by the prosecutor's

19   having, apparently obdurately, delayed turning over impeachment material as to a couple of the

20   prosecution's witnesses until he called them to the stand, petitioner concedes that a short

21   continuance was granted and that the prosecutor was reprimanded, and petitioner does not

22   identify the impeaching material or demonstrate how the subsequent cross-examination was

23   inadequate.  This portion of his prosecutorial misconduct claim does not support petitioner's

24   claim to entitlement to habeas relief.

25          2) *Improper Questioning of Witnesses*

26       Petitioner, noting that the Ninth Circuit has refused consistently to find a violation

of due process, for an isolated instance of improper questioning, citing <u>Ortiz v. Stewart</u>,[16] argues that in the instant case, "the prosecution's improper generalized and prejudicial references to gangs were anything but isolated, and rendered the proceedings fundamentally unfair." AP, p. 17. Petitioner also contends that the prosecutor was persistent in refusing to abide with the rulings of the court by repeating immediately a question with a slight change in phrasing but not in meaning after the court had sustained an objection for which the trial court more than once chided the prosecutor. Id., citing RT 2826, 2974, 3347. Petitioner maintains that these questions often related to the prosecutor's theme of gang retaliation, so that even when the court did not allow him to bring out gang evidence, the jury heard his gang theme. Id., citing RT 2818-2821 (identified as prosecution questions about MAC to Ahn Phan); RT 3242-3244 (identified as prosecution questions to Si Dang about MAC); RT 3280-3281(identified as questions to Si Dang concerning whether he feared the police would consider the case to be gang-related).

According to petitioner, although the fact that one of the weapons in Hung Nguyen's car had been stolen was ruled inadmissible, the prosecutor asked the evidence technician whether there had been a serial number on the gun, to which he responded in the negative. AP, p. 17. When the prosecutor followed up with a question as to whether it would be possible to buy a gun in such a condition, the answer was also no. Id. In addition to sustaining an objection, the trial judge granted a motion to strike the answer. Id., citing RT 837.

Petitioner also provides the specific example of the prosecutor asking, while trying to establish murder as a natural and probable consequence of "'gang retaliation:'"

> Is it foreseeable that when gang retaliation - - based upon our
> common experiences and what we see every day in the newspapers
> and on television that gang retaliation results in someone dying?

AP, p. 17. While noting that, upon objection, the trial court admonished the prosecutor to stick to the facts of the case (citing RT 3918-3919), petitioner contends that the prosecutor was clearly

---

[16] 149 F.3d 923, 934 (9th Cir. 1998)(finding three separate alleged acts of prosecutorial misconduct not to be a deprivation of due process).

1  making an effort the taint the objectivity of the jury with undue emphasis on gang-related

2  violence, despite the court's admonishment not to do so.  Id. at 18.

3          The state court of appeal analyzed this portion of the prosecutorial misconduct

4  claim as follows:

5          [] Alleged misconduct in questioning witnesses.

6          [] Reference to the lack of a serial number on a weapon.
          [22]  The trial court ruled that evidence that the guns found in
7          Hung Nguyen's car had been stolen was irrelevant. It directed
          counsel to instruct witnesses not to volunteer such evidence.
8          Nonetheless, the prosecutor elicited evidence from a technician
          that the serial number on one of the shotguns recovered from Hung
9          Nguyen's car was "worn off or not there." The prosecutor then
          asked, "Can you buy that weapon in that condition?" to which the
10         witness responded, "No, you can't." The trial court sustained a
          defense objection and granted a motion to strike.

11
          Defendants insist that this exchange demonstrates that the
12         prosecutor "intentionally sought testimony from the witness as to
          the stolen nature of the gun" in contravention of the court's ruling.
13
          However, to the extent that the successful motion to strike did not
14         cure any prejudice, an admonition to the jury would have.  By
          failing to request an admonition to the jury, defendants failed to
15         preserve any claim of prosecutorial misconduct arising from the
          questioning of this witness. " '[T]he point is reviewable only if an
16         admonition would not have cured the harm caused by the
          misconduct.' " (*People v. Gionis, supra,* 9 Cal.4th at p. 1215, 40
17         Cal.Rptr.2d 456, 892 P.2d 1199; *People v. Monteil, supra,* 5
          Cal.4th at p. 914, 21 Cal.Rptr.2d 705, 855 P.2d 1277.) In any
18         event, this testimony was harmless.

19  People v. Tran, 2003 WL 21061575 at *34-*35.

20  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

21         [] Objectionable questions.

22         Defendants complain that the prosecutor asked irrelevant,
          speculative, argumentative, cumulative, and leading questions, as
23         well as questions that lacked foundation, exceeded the scope of
          examination, or sought to elicit hearsay evidence.

24
          [25]  We conclude from our review of the record that the
25         prosecutor's extensive use of objectionable examination methods,
          although inappropriate, did not constitute prejudicial misconduct,
26         as it neither infected the trial with such unfairness so as to deny

defendants due process nor involved the use of " ' " ' "deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citation.]" ( *Hill, supra*, 17 Cal.4th at p. 819, 72 Cal.Rptr.2d 656, 952 P.2d 673.)

Moreover, defendants concede on appeal that when there was improper questioning by the prosecutor, the court sustained defense objections, and on some occasions, either admonished counsel or found the prosecutor's methods objectionable on its own motion. In short, either prejudice was avoided by the successful objections to the prosecutor's questions, or any misconduct was waived where appropriate objections were not made.

Finally, as a result of the court's consistent sustaining of objections to improper questioning by the prosecutor, the jury must have been aware that the trial court took a dim view of the prosecutor's questioning on various occasions, which could have only redounded to the defendants' benefit. FN33

> FN33. Len takes a slightly different approach and argues that "there is a reasonable likelihood that the prosecutor's tactic gave the jury the impression that defendants, with the assistance of the trial court [were] preventing them from learning information that would be helpful to them in deciding the case." This is not only speculation, but the fact that the court sustained the objections would more likely have given the jury the impression that any additional information was irrelevant or improper. And, of course, the jury instructions advised the jury that "[i]f an objection was sustained to a question, ... not [to] guess what the answer might have been...."

People v. Tran, 2003 WL 21061575 at *35-*36.

Discussion

As the Ninth Circuit has stated:

A determination that the prosecutor's questioning was improper is insufficient in and of itself to warrant reversal.  As the Supreme Court explained in *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181, 106 S.Ct. 2464 (internal quotations omitted). In the instant case, it is clear that the prosecutor's questioning of Bernice did not "so infect the trial with unfairness" as to deprive Ortiz of a fair trial.

1   Ortiz v. Stewart, 149 F.3d at 234.

2        In light of the federal habeas standard, this court does not find that the state court

3   of appeal's analysis of the prosecutor's questions at issue was an unreasonable application of

4   established Supreme Court authority.  Petitioner himself indicates that the prosecutor was

5   admonished, and a motion to strike granted, as to the reference to the weapon from which the

6   serial number was "worn off or not there" and whether it could be bought in such a condition.

7   Thus, it was made evident to the jury that such testimony was not to be considered.  As to

8   improper questions regarding the prosecutor's "gang theme," this court agrees with Judge

9   Moulds' analysis with regard to a co-defendant that the record does not support a finding of a due

10  process violation regarding the prosecutor's objectionable questions as, "[w]hile the prosecutor

11  was overzealous..., the instances evidencing prosecutorial misconduct are not as strong or

12  persuasive as petitioner contends."  Nguyen v. Kane, 2009 WL 3823962 * 19.  As noted by the

13  state appellate court, the trial court sustained objections by the defense to improper questioning

14  of witnesses by the prosecutor, occasionally admonishing him.  Id.; People v. Tran, 2003 WL

15  21061575 at *36.  Based on this aspect of his prosecutorial misconduct claim, petitioner does not

16  show entitlement to habeas relief because the prosecutor's overzealousness while undesirable has

17  not been shown to have 'so infected the trial with unfairness as to make the resulting conviction a

18  denial of due process.' "  Darden v. Wainwright, 477 U.S. at 181, 106 S.Ct. 2464 (citations

19  omitted).

20       3) *Improper Arguments to the Jury*

21       Citing Darden v. Wainwright, 477 U.S. 168, 182 (1986), for the principle that

22  relief is appropriate when a prosecutor's closing arguments "'manipulate or misstate the

23  evidence'" or "'implicate other specific rights of the accused,'" petitioner contends that

24  manipulating the evidence is precisely what the prosecutor in this case did "by incorporating

25  gang evidence in order to prejudice the jury and prey on the jury's fears, and the prosecution

26  misstated the law in order to gain a conviction on a lower burden of proof than the "beyond a

1  reasonable doubt" standard.  AP, p. 18.

2          Petitioner references the prosecutor's comments about gangs and gang violence

3  made to the jury in spite of the trial court's having excluded, as unduly prejudicial, expert

4  testimony on gangs as, citing the following instance:

5              We're also talking about criminal street gangs.  And what is the
               primary purpose of the criminal streets [sic] gangs?  To commit
6              crimes.  Are those individuals usually armed?  Do those
               individuals usually have violent consequences when they come in
7              confrontation?  Look at the name that's used here, the Mafia Asian
               Crew?  What does that show you?  That shows you an idolization
8              of the Italian crime syndicate.

9  AP, p. 18, citing RT 3976.

10         Petitioner notes the trial court overruled defense objections to this line of

11 argument, id., citing RT 3978, at which point the prosecutor asked: "Doesn't the Mafia use hit

12 men?," to which the court did sustain an objection, telling the prosecutor to stick to the facts of

13 the case.  Id., citing RT 3978-3979.  The prosecutor went on to ask if the jurors had "heard of the

14 Mafia.  I think so.  Hit man or rub out an enemy?"  Id., citing RT 3979.  The court at this point

15 again told the prosecutor to argue the facts of the case.  Id.  The prosecutor nevertheless

16 continued: "And we've seen in the news that a family driving on the wrong street in LA was

17 shown to be disrespectful."  Id.  The defense objected and "the trial court instructed the jury 'to

18 disregard anything that happened in LA,' but denied a motion for mistrial."  AP, p. 18-19,

19 quoting RT 3981-3982.

20         In addition to continuing to call the MAC a criminal street gang, the prosecutor

21 also argued that there was no evidence that prosecution witnesses Cuong, Phillip or Huy had

22 been involved in "crimes of violence, crimes involving guns," even though in doing so,

23 according to petitioner, he was engaging in misconduct because he had successfully persuaded

24 the trial court to exclude evidence that Phillip and Cuong had been involved in crimes with

25 handguns and was capitalizing on his successful effort to keep this evidence from the jury by

26 arguing that there was no such evidence existed.  AP, p. 19, citing RT 1738, 1740, 1810, 2081-

50

2082, 4197.  Petitioner cites only <u>People v. Contreras</u>, 66 Cal. App.4th 842, 849, 851 (1998), in support of his proposition that it is misconduct to keep evidence that is potentially damaging from the jury by arguing there is no such evidence, but this opinion has been depublished at the direction of the California Supreme Court by order dated January 13, 1999, which the state appellate court noted, stating:

> [29]  Defendants complain that "[t]o bolster the credibility of Phillip [Nguyen] and Cuong [Phan], the prosecutor argued in his closing argument there was no evidence they had ever been illegally involved with guns."  They claim that this "was factually inaccurate and contradicted by the evidence the defense had unsuccessfully sought to bring in."
>
> In his rebuttal argument, the prosecutor urged the jury to reject attacks upon the credibility of prosecution witnesses Phillip Nguyen, Cuong Phan, and Huy Vo: "So on what grounds are we told not to believe them? Cuong Phan, no criminal record. Huy Vo, no criminal record. Phillip Nguyen, we heard he's a burglar. He drives stolen cars or whatever he does. [¶] ... [¶] ... What's missing? Crimes of violence, crimes involving guns. [¶] Have you heard anything about these individuals having guns? Do we know the defendants have guns? Yes. Because they used them."
>
> We do not entertain defendants' contention on appeal that this rebuttal argument by the prosecutor represented a misrepresentation of the facts.  Defendants neither objected nor sought admonitions regarding these comments.  Nor have they shown that a timely objection or request for an admonition would not have cured the harm.FN35
>
> > FN35. We also note that in their argument the defendants rely upon *People v. Contreras* (1998) 66 Cal.App.4th 842, 78 Cal.Rptr.2d 349 (*Contreras II*), which has been depublished. (Cal. Rules of Court, rule 977.)
>
> Likewise, defendants complain about the prosecutor's argument that Andy "was never violent," but no objection was made to this statement either and is thus waived.

<u>People v. Tran</u>, 2003 WL 21061575 at *41-*42.

Petitioner contends that the prosecutor's statements were improperly designed to invoke fear on the part of the jurors, quoting <u>United States v. Weatherspoon</u>, 410 F.3d 1142, 1149 (9th Cir. 2005), for the principle that courts have "consistently cautioned against

prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury....."  AP, p. 19.  Petitioner notes that the Ninth Circuit has stated that prosecutorial arguments "clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact," are "irrelevant and improper."  Id., quoting Weatherspoon, 410 F.3d at 1150.

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

Id., quoting United States v. Monaghan, 741 F.2d 1434, 1441 (D.C. Cir. 1984).

Notwithstanding this authority, petitioner contends that prosecutor played on jurors' fears by providing evidence of frightening examples of gang activity/behavior that was not part of the evidence:

> Why do they call them gangs?.... [¶] a drive-by shooting, it takes a driver and shooter.  You don't hear drive-by shootings happen by themselves. [¶] What do we have here?  We have people acting as a gang operating in concert, more than one person ganging up on an individual. [¶] We're also talking criminal street gangs.  And what is the primary purpose of the criminal streets [sic] gangs?  To commit crimes.  Are those individuals usually armed?  Do those individuals usually have violent consequences when they come in confrontation?  Look at the name that's used here, the Mafia Asian Crew?  What does that show you?  That shows you an idolization of the Italian crime syndicate.

AP, p. 20, citing RT 3976.  Petitioner observes that the defense objection was overruled.  Id., citing RT 3978.

Petitioner notes the prosecutor's continued reference to the Mafia which he contends played on jurors' fears:

> We're a gang called the Mafia Asian Crew.  Now, have you ever heard about the Mafia doing hits, the Mafia having retaliation, the Mafia rubbing out his enemies and using guns?  Have you ever heard of Mafia hit men?  Isn't this what this evidence is all about?

AP, p. 20, citing RT 4207.

Petitioner also draws attention to the prosecutor's question to the jury about seeing gang members in a movie theater "staring at you" or at a mall "disrupting business."  AP, p. 20, citing RT 4211.  He notes the follow-up reference to the incident involving "driving down the wrong street in Los Angeles."  Id.

> It can be right over here on March Lane pointing to somebody saying your high beams are on, and that's misrepresented as a rival gang signal.  And you're hunted down and shot in the back in your car with a MAC 10.

Id.

The state appellate court provided the following analysis as to this claim:

[] Alleged misconduct during closing argument.

Defendants claim that "[p]erhaps the most egregious misconduct occurred during closing arguments."

" ' "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets....' " ' [Citation.]" ( *Williams III, supra*, 16 Cal.4th at p. 221, 66 Cal.Rptr.2d 123, 940 P.2d 710; *People v. Dennis* (1998) 17 Cal.4th 468, 521, 71 Cal.Rptr.2d 680, 950 P.2d 1035; see also *People v. Sandoval* (1992) 4 Cal.4th 155, 180, 14 Cal.Rptr.2d 342, 841 P.2d 862 ["Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence"].)

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" ( *Frye, supra*, 18 Cal.4th at p. 970, 77 Cal.Rptr.2d 25, 959 P.2d 183; see also *People v. Samayoa* (1997) 15 Cal.4th 795, 841, 64 Cal.Rptr.2d 400, 938 P.2d 2.)

In accordance with these principles, we conclude that the claimed instances of misconduct were not prejudicial.

a. References to gangs.
Defendants complain that "the prosecutor repeatedly discussed gang violence on television, movies, and on the streets of Los Angeles, comparing the defendants to Mafia hit men."

In his closing argument, the prosecutor reiterated his theory that Andy's shooting was a gang retaliation, and in so doing, he drew objections from defense counsel as set forth below:

"[THE PROSECUTOR]: Is it foreseeable that when gang retaliation-based upon our common experiences and what we see every day in the newspapers and on television that gang retaliation results in someone dying?

"[COUNSEL FOR LEN]: That's clearly improper. [¶] Ask the Court to admonish him as to using other cases and instances, what the jurors have read in the newspaper, in order to convict these individuals.

"THE COURT: Sustained. [¶] Limit it to arguing this case, counsel. [¶] ... [¶]

"[THE PROSECUTOR]: Why is their gang called [the Mafia Asian Crew]? Because, one, they idolize the Italian crime syndicate. They want to be like them. They want control.

"[COUNSEL FOR NHAT]: I object. This is designed to inflame the passions of the jury.

"[COUNSEL FOR KIET]: He's invoking the connotations. It's probably an insult to the Italian-American on the jury I'm sure.

"THE COURT: If so, I'll be insulted. Overruled.

"[THE PROSECUTOR]: Doesn't the Mafia use hit men and use-is there an objection?

"[COUNSEL FOR LEN]: Yes, there is.

"[THE PROSECUTOR]: Go figure. Imagine that.

"THE COURT: State your grounds.

"[COUNSEL FOR LEN]: It's improper argument for him to try to compare that things that go on in the world to specifics of this case. He's supposed to stick to the evidence and comment on his theory as to what this evidence is.

1    "[COUNSEL FOR KIET]: He's going to mention Charles Manson in a few minutes or Hitler.  He's gone beyond the pale, Your

2    Honor.

3    "THE COURT: Stop arguing and state the grounds.

4    "[COUNSEL FOR KIET]: Misconduct and improper argument by the prosecutor who has a higher duty to argue the case in good faith

5    and prosecute the case in good faith.

6    "THE COURT: You've stated your grounds. [¶] I would direct the District Attorney to be specific to the facts of this case. [¶]

7    Objection sustained.

8    "[THE PROSECUTOR]: Has anyone heard of the Mafia? I think so. Hit man or rub out an enemy? [¶] Have you ever heard of the

9    Mafia-

10    "[COUNSEL FOR LEN]: You just sustained the objection to the that [ sic ] line of inquiry.

11

12    "THE COURT: Yes, I did.

13    "[COUNSEL FOR KIET]: He just did it again.

14    "THE COURT: Mr. Freitas [the prosecutor], limit yourself to facts in this case.

15    "[COUNSEL FOR KIET]: Thank you.

16    "[COUNSEL FOR NHAT]: I ask for a citation of misconduct.

17    "[COUNSEL FOR KIET]: He's getting ready to do it one more time.

18

19    "THE COURT: I'll take it up at the break out of the presence of the jury.

20    "[THE PROSECUTOR]: Why do you think they call themselves the Mafia Asian Crew? There's a reason they call themselves the

21    Mafia Asian Crew. Doesn't it show what their [intent] was when they were over at [the Phan house]? They weren't there to collect

22    any $40. Make no mistake about it. When-if you were there to collect $40 and you bring this, that is robbery. That's a crime.

23

24    "How do we know the defendants are gang members? Look what the evidence has been. We have Nhat's uncontradicted self-admission that he claimed the Mafia Asian Crew to Deputy

25    Morales.

26    "Also we have Si's admission to Detective Salsedo when he

says[,]['']You got me.['] He then attempts to cover it up and say different things. But the fact of the matter is he said[,]['']You got me.['] He is a member of the Mafia Asian Crew.

"Also his girlfriend for a year or eight months at the time of this, she identifies him as a member. And not only does she identify him, but she also identifies his friends as being members of this Mafia Asian Crew.... [¶] ... [¶]

"And when they went over there, it was solely for the rivalry as described by Anh Phan to Detective Salsedo, to get retaliation upon a person they believed to be a rival gang member.

"When you look at gangs, you're really looking at three R's. That's rivalries, respect and retaliation. And we know even on West Side Story, the academy award-winning film, that these gangs have rivalries, and these rivalries are-in fact, can be caused by the second R, respect, lack of respect.

"And we've seen in the news that a family driving on the wrong street in L.A. was shown to be disrespectful, and-

"[COUNSEL FOR LEN]: That's what he can't do. That's improper to try to-

"[THE PROSECUTOR]: Yes.

"[COUNSEL FOR LEN]: No, you can't. You don't know what you're doing. [¶] Improper argument.  He's trying to inflame the jury.  I ask for a mistrial based on his continued conduct.

"THE COURT: Mistrial is denied. [¶] Disregard anything that happened in L.A.

"[COUNSEL FOR LEN]: Thank you. At least it's on the record. [¶] The last objection was sustained, right, Your Honor?

"THE COURT: Yes, counsel. [¶] Proceed, Mr. Freitas [the prosecutor].

"[COUNSEL FOR NHAT]: I would seek a citation of misconduct?

"THE COURT: Denied."

In rebuttal, the prosecutor reprised his theme:

"[THE PROSECUTOR]: We're a gang called the Mafia Asian Crew. Now, have you ever heard about the Mafia doing hits, the Mafia having retaliation, the Mafia rubbing out [its] enemies and using guns? Have you ever heard of Mafia hit men? Isn't this what this evidence is about? [¶] ... [¶]

"And what do we know about these rivalries? We've heard [Counsel for Kiet]'s eloquent speech about the movie The Killing Fields, walking over bones to get out of Vietnam, the fighting to get on a helicopter, landing on a ship.

"What do we know about these rivalries? While you were seeing the movie of The Killing Fields, did they happen to have another movie called Colors or American Me or how about a movie called M[i] Vida Loc[a]? How about a movie called Boy[z]['N] the Hood?

"How about while you were at the movie theater, were there gang members there and staring at you? Were they in a pack?

"When you go shopping at the mall, do you see them walking? Do you see them jostling?  Do you see them disrupting business?

"What do we know about gang members?  We know they congregate. We know they have rivalries. We know there's red people, blue people, no color people.

"Do we know that they retaliate?  What do we see?  For the slightest amount of disrespect or for merely being a rival[,] retaliation is exacted.

"And what type of retaliation?  Immediate, escalating-and by escalating I mean if you hit me, I stab you.  If you stab me, I shoot you or maybe it skips all the way up.

"What do we know about disrespect?  We know it can be driving down the wrong street in Los Angeles. It can be right over here on March Lane pointing to somebody saying, [']Your high beams are on,['] and that's misinterpreted as a rival gang sign. And you're hunted down and shot in the back in your car with a MAC 10.

"[COUNSEL FOR NHAT]: I object, Your Honor. That's not this case.

THE COURT: Objection is noted and overruled. [¶] You may complete your argument."

[26]  To the extent defendants base their assignment of misconduct on the claim that it was improper for the prosecutor to argue that all defendants were gang members, it has no merit. There was sufficient evidence in this case from which a reasonable trier of fact could infer that Andy's killing was motivated by his perceived disrespect for Len, who associated himself with a rival gang, and that the defendants who carried out the retaliation were affiliated with the Mafia Asian Crew. After all, Nhat admitted that he was a member of the gang, Si at one point acknowledged that he was a member, and Si's girlfriend said that "Si and his friends belonged

1    to MAC."

2    Nor was it misconduct for the prosecutor to characterize MAC as a
     "criminal street gang" without having earlier established that
3    phrase within the meaning of section 186.22. The defendants were
     not charged under section 186.22. It is therefore likely that the jury
4    understood the prosecutor, by his use of that phrase, to be arguing
     that persons affiliated with MAC engaged in unlawful conduct,
5    such as the crimes with which defendants were charged, and the
     maintenance of an arsenal of ammunition and weapons.

6
     Defendants contend that the prosecutor's repeated efforts to
7    analogize MAC to popular images of the Italian Mafia-including
     his references to "hit men" and "rubbing people out"-were
8    improper appeals to the jury's passions, designed to "invoke[ ] the
     specter of gang violence," and invitations to find defendants guilty
9    based on facts outside the record. While the court could have
     exercised its discretion to bar such comments, we are unpersuaded
10   that it is reasonably likely that the jury understood the challenged
     comments in an improper or erroneous manner. ( *Frye, supra*, 18
11   Cal.4th at p. 970, 77 Cal.Rptr.2d 25, 959 P.2d 183.)  In all
     likelihood, the jury understood those references to be an effort to
12   invoke such permissible " ' "illustrations drawn from common
     experience, history or literature." ' " ( *Williams III, supra*, 16
13   Cal.4th at p. 221, 66 Cal.Rptr.2d 123, 940 P.2d 710.) Surely, jurors
     would not have believed that MAC was the mafia.  And we cannot
14   help but note that defendants' weapons arsenal and their crime of
     spraying gunfire in a private home, combined with their choice of a
15   gang name," that used the term "Mafia," had an aura of the Mafia, as
     portrayed in popular culture. Thus, the analogy was not inapposite.

16
     We do agree with defendants that the trial court should have
17   sustained the second objection to the prosecutor's reference to
     driving down the wrong street in Los Angeles, but the reference
18   could not have been prejudicial.

19   Finally, we reject defendants' challenge to the prosecutor's
     assertion in closing argument that Len was a gang member. The
20   prosecutor was entitled to argue that Len was a gang member from
     the admissible evidence that Len was one of Si's friends, that Si's
21   girlfriend reported that Si and his friends were members of MAC,
     and that gang members accompanied Len to search for Andy after
22   his fight and the following day.

23   People v. Tran, 2003 WL 21061575 at *36-*40.

24   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - - - -- - - - - - - - - -
         []     Appeals to jurors' fears.
25
         [34]  In discussing reasonable doubt during his rebuttal, the
26   prosecutor made the following argument over a defense objection:

"And it's not percentages. You heard some things about, well, 51 percent is a preponderance of the evidence, and clear and convincing is somewhere else. [¶] The law is not defined by percentages, but I submit this to you: If the defendants told you they were going to kill, wouldn't you be 100 percent certain that would happen[?] [¶] ... [¶] If Si Dang said he was going to kill, wouldn't you be a hundred percent certain that would happen? [¶] If Nhat Nguyen said he was going to kill you, wouldn't you be one hundred percent sure he was going to kill you? [¶] If Kiet Tran said he was going to kill you, wouldn't you be one hundred percent certain he was going to kill you? And Len Nguyen-"

Defendants contend that the prosecutor intended by this argument to infuse the jury members with fear for their own safety.

It is improper for the prosecutor to appeal to the passion and prejudice of the jury in closing argument during the guilt phase of trial. ( *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250, 278 Cal.Rptr. 640, 805 P.2d 899; *People v. Simington* (1993) 19 Cal.App.4th 1374, 1378, 23 Cal.Rptr.2d 769.)  Rhetorical devices of the type employed by the prosecutor here have been found to be misconduct. (E.g., *People v. Pensinger, supra*, 52 Cal.3d at p. 1250, 278 Cal.Rptr. 640, 805 P.2d 899 ["Suppose instead of being Vickie Melander's kid [the victim] this had happened to one of your children"]; *People v. Simington, supra*, 19 Cal.App.4th at p. 1379, 23 Cal.Rptr.2d 769 ["ask[ing] the jurors to place themselves in the position of an innocent victim who is assaulted with a knife and sustains serious injuries" is misconduct]; *People v. Jones* (1970) 7 Cal.App.3d 358, 363, 86 Cal.Rptr. 516 [argument "to the effect that the sons of the jurors and their girlfriends dare not ride motorcycles into an area where the appellant is located, because he reacts seriously," was "a crude appeal to the fears and emotions of the jurors"].)

*45 [35]  Therefore, we agree that the remarks by the prosecutor here constituted an improper appeal to the passion and prejudice of the jury. The objection, which was timely made on the ground that the remarks were improper suggestions that the defendants could pose a threat to the jurors, should have been sustained. But we also conclude that the error was harmless. (See *People v. Pensinger*, *supra*, 52 Cal.3d at pp. 1250-1251, 278 Cal.Rptr. 640, 805 P.2d 899 [misconduct harmless]; *People v. Simington, supra*, 19 Cal.App.4th at pp. 1379-1380, 23 Cal.Rptr.2d 769 [same]; *People v. Jones, supra*, 7 Cal.App.3d at pp. 363-364, 86 Cal.Rptr. 516.) It cannot be said that it is reasonably probable that a different result would have been reached in the absence of these brief remarks in the context of lengthy closing arguments. And the prosecutor could have made the very same point about the defendants' coldheartedness in a proper fashion had the objection been sustained.

1    In sum, we find no denial of due process or of a fair trial as a result
     of any misconduct committed by the prosecutor. The Attorney
2    General characterizes the challenged remarks of the prosecutor as
     "unartful," "ill-advised," and "aggressive, if somewhat misguided"
3    advocacy. Although, in our view, the arguments by both sides were
     unduly argumentative and personal on occasion, the limited
4    number of instances of misconduct to which defendants objected
     were not so severe as to undermine the jury's fair consideration of
5    the evidence.

6    People v. Tran, 2003 WL 21061575 at *44- *45.

7              Petitioner maintains that the whole thrust of the prosecutor's argument vis-à-vis

8    petitioner was that he should have known when he involved Si and the others that there would be

9    a deadly response because gang members are known to engage in wanton violence but that the

10   jury's having found the vicarious arming allegation as to petitioner "not true" shows that jurors

11   were not persuaded that petitioner should be held responsible for the gun being present at the

12   incident.  AP, p.21.  These findings, according to petitioner, objectively support the conclusion

13   the prosecutor's gang violence rhetoric "persuaded the jury that petitioner could be held liable for

14   murder and attempted murder because gangs commit violent acts, rather than on the basis of

15   evidence indicating that he knew or had reason to believe that his conduct would result in

16   potentially lethal violence."  Id.

17             The record indicates that the prosecutor's closing argument took place over three

18   days, comprising nearly 200 pages[17] of the Reporter's Transcript.  Nguyen v. Kane, 2009 WL

19   3823962 at *19, citing RT 3904-45; 3950-95; 4174-4234; 4237-4287.  The Ninth Circuit has

20   made clear that on direct appeal a new trial is not required arising from "improprieties in

21   counsel's argument to the jury...unless they are so gross as to probably prejudice the defendant

22   and that prejudice has not been neutralized by the trial judge."  United States v. Cox, 633 F.2d

23   87,  875 (9th Cir.1980), citing United States v. Parker, 549 F.2d 1217, 1222 (9th Cir. 1977); cert.

24   denied, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977); United States v. Mikka, 586 F.2d

25

26         [17] Almost 196 pages to be more precise.

152 (9th Cir. 1978).   Considering each aspect of petitioner's prosecutorial misconduct claim

individually or in combination the record does reveal that the prosecutor did engage in

improprieties both in witness questioning and in argument.   However, as the state court noted,

the evidence in this case was sufficient for a reasonable trier of fact to infer that the victim's

death was motivated by his perceived disrespect for petitioner:

> who associated himself with a rival gang, and that the defendants
> who carried out the retaliation were affiliated with the Mafia Asian
> Crew. After all, Nhat admitted that he was a member of the gang,
> Si at one point acknowledged that he was a member, and Si's
> girlfriend said that "Si and his friends belonged to MAC."

People v. Tran, 2003 WL 21061575 at *39.  That petitioner was not found liable for an arming

enhancement (which also appears to have been the case with co-defendant Nhat) does not mean

that his due process rights were violated by the prosecutor's gang references.

<u>Claim 4: Cumulative Effect of Errors Violated Due Process Rights</u>

In his fourth claim, petitioner contends that the cumulative effect of the errors

committed violated his right to due process.  AP, pp. 24-25.  The state appellate court offered this

succinct analysis in rejecting that claim as to all of the defendants:

> The litmus test in assessing the cumulative effect of errors "is
> whether defendant received due process and a fair trial." ( *People
> v. Kronemyer* (1987) 189 Cal.App.3d 314, 349, 234 Cal.Rptr. 442.)
> We have rejected many of defendants' contentions, finding no
> error. We believe the few isolated instances of error that we have
> found did not affect the fairness of the trial, either individually or
> taken together. "A defendant is entitled to a fair trial, not a perfect
> one." ( *People v. Mincey* (1992) 2 Cal.4th 408, 454, 6 Cal.Rptr.2d
> 822, 827 P.2d 388.) Long criminal trials are rarely perfect. ( *Hill,
> supra*, 17 Cal.4th at p. 844, 72 Cal.Rptr.2d 656, 952 P.2d 673.)
> But the trial judge here showed admirable patience and made
> herculean efforts, including repeated continuances, to give
> defendants a fair trial.  Defendants received that fair trial.

People v. Tran, 2003 WL 21061575 at *45; <u>Findings and Recommendations</u>, Case No. 2:04-CV-

1829 GEB JFM, 11/13/09, at 64.

The Ninth Circuit has stated:

> The Supreme Court has clearly established that the combined effect

61

of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers [v. Mississippi*, 410 U.S. [284] at 298, 302-03, 93 S.Ct. 1038 [1973] (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial").FN5 The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Chambers,* 410 U.S. at 290 n. 3, 93 S.Ct. 1038.FN6

FN5. See also *Montana v. Egelhoff*, 518 U.S. 37, 53, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (stating that *Chambers* held that "erroneous evidentiary rulings can, in combination, rise to the level of a due process violation"); *Taylor v. Kentucky*, 436 U.S. 478, 487 n. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness....").

Although we have never expressly stated that *Chambers* clearly establishes the cumulative error doctrine, we have long recognized the due process principles underlying *Chambers*. See, e.g., *Thomas v. Hubbard*, 273 F.3d 1164, 1179-80 (9th Cir.2002) (analyzing cumulative error in AEDPA habeas petition); *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir.2000) (noting that cumulative error doctrine applies on pre-AEDPA habeas review); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996) (recognizing the importance of considering "the cumulative effect of multiple errors").

FN6. See also *Thomas*, 273 F.3d at 1179 ("In analyzing prejudice in a case in which it is questionable whether any 'single trial error examined in isolation is sufficiently prejudicial to warrant reversal,' this court has recognized the importance of considering 'the cumulative effect of multiple errors' and not simply conducting 'a balkanized, issue-by-issue harmless error review.' ") (quoting *Frederick,* 78 F.3d at 1381).

Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007).

As was stated in denying one of petitioner's co-defendant's claim of cumulative error:

However, where there is no single constitutional error existing,

1    nothing can accumulate to the level of a constitutional violation.
     See *Mancuso v. Olivarez*, 282 F.3d 728, 745 (9th Cir.2002); *Fuller*
2    *v. Roe*, 182 F.3d 699, 704 (9th Cir.1999); *Rupe v. Wood*, 93 F.3d
     1434, 1445 (9th Cir.1996).
3
     As noted above, this court finds petitioner has suffered no
4    constitutional violation, so there is nothing to accumulate. This
     claim must also fail.
5

6    Nguyen v. Kane, 2009 WL 3823962 at *46.

7         The judgment of the state court on the claim of cumulative error was not an

8    unreasonable application of clearly established Supreme Court authority.

9         Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of

10   habeas corpus be denied.

11        These findings and recommendations are submitted to the United States District

12   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

13   days after being served with these findings and recommendations, any party may file written

14   objections with the court and serve a copy on all parties.  Such a document should be captioned

15   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16   shall be served and filed within fourteen days after service of the objections.  The parties are

17   advised that failure to file objections within the specified time may waive the right to appeal the

18   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19   DATED:   03/18/2011

20                                    /s/ Gregory G. Hollows

21                                    _____
                                      GREGORY G. HOLLOWS
                                      UNITED STATES MAGISTRATE JUDGE
22

23
     GGH:009
24   nguy2381.fr

25

26

                                      63